THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MELANIE SCHLIG, Defendant-Appellant.

Second District   No. 82—618

Opinion filed December 20, 1983.

Lyle B. Haskin, of Wheaton, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Barbara Preiner, Assistant State's Attorney, and Phyllis J. Perko and Raymond L. Beck, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE NASH delivered the opinion of the court:

Defendant, Melanie Schlig, was found guilty after a bench trial of unlawful delivery of a controlled substance containing more than 30 grams of cocaine (Ill. Rev. Stat. 1981, ch. 56½, par. 1401(a)(2)) and sentenced to imprisonment for six years. On appeal, she challenges the admission in evidence of expert testimony concerning the nature and weight of the substance in question and the sufficiency of the evidence to sustain her conviction.

Defendant was tried jointly with Gregory Duerr, not a party to this appeal, for the delivery of a quantity of cocaine on November 3, 1981. Paul Toledo, who had been acting as a confidential informant for the Du Page County sheriff's office, testified that during the last part of October 1981, he had several conversations with Carla Szfarek (who testified at trial under her married name, Carla Szfarek Spinato)

concerning the purchase of cocaine. She was Gregory Duerr's girl friend and a friend of defendant.

Detective Michael Tellone testified that at approximately 9 p.m. on November 3, 1981, he accompanied Toledo to the parking lot of the Golden Bear restaurant in Addison, Illinois. At that time Tellone had in his possession $4,000 in currency. After they parked in the lot, defendant approached the vehicle and asked why they were so late and stated "that John and Greg were waiting for us. They had the coke, but that we would have to go to the Outlaws on North Avenue to meet with John and Greg." Defendant further stated that John and Greg "wanted $5,000 for the cocaine for two ounces" and Tellone responded that he would have to discuss the matter with them. Defendant asked Tellone and Toledo to accompany her in her car, but Tellone insisted that he and Toledo were to follow her to the Outlaws. The cars proceeded to a shopping center and parked some distance from the Outlaws, in front of the Seven Brothers restaurant. Defendant again approached Tellone's vehicle and said "that John and Greg were there and that they had the coke." Defendant walked away from the car and returned a few seconds later in the company of Gregory Duerr. A conversation ensued between Duerr and Tellone, during which defendant remained standing next to Duerr. Duerr asked Tellone for $5,000 and when Tellone displayed the $4,000 which had previously been furnished to him, Duerr said, "That's good enough for me" and then brought a third subject, John Simpson, to the car. Simpson got into the back of Tellone's vehicle and handed Tellone an envelope containing a substance later analyzed as cocaine. Tellone began to open the envelope and requested that Duerr and defendant move away from the car; at that point defendant and the others involved in the transaction were arrested. Tellone acknowledged that he did not see defendant either with the money or the cocaine.

Paul Toledo testified that he was introduced to the people involved in this transaction through Carla Szfarek, whom he first met at a Denny's restaurant in October 1981, and he discussed the purchase of a gram of cocaine with Szfarek and Gregory Duerr. Toledo thereafter made a purchase of one gram of cocaine from Szfarek outside her apartment on October 28. Detective Tellone was in Toledo's car at that time and inquired about the purchase of a larger quantity. Toledo called Szfarek on November 2 and inquired about the purchase of two ounces of cocaine, and a transaction was agreed upon for the following evening. When Toledo arrived at Szfarek's residence the following evening, defendant was present. Toledo was unable to make the transaction immediately, and Szfarek directed defendant to call

"Greg" and inform him that they would be late. Toledo overheard defendant dial a telephone number and ask for Greg, and at the conclusion of the call was informed by defendant that "there shouldn't be no problem at all." Toledo overheard defendant make a second telephone call, after which she informed him that the price would be $5,000 for two ounces of coke and that the meeting would be between 9 and 9:30 at the Golden Bear restaurant in Addison. As the parties were leaving Szfarek's apartment for the restaurant, defendant asked if she could accompany Toledo in his car, but he replied that he was going to pick up his cousin and declined. Toledo then picked up Detective Tellone and arrived at the Golden Bear at about 10 o'clock. Toledo's account of the ensuing events was generally consistent with Tellone's, although he testified that during the conversation at the Golden Bear defendant stated, "They've got the coke, and if we don't get over there, they are going to kill us." Toledo's testimony concerning his prior record was confused, but he appeared to acknowledge prior convictions for burglary, two convictions for theft, and two convictions for forgery. He also had three pending charges for burglary and one for theft.

Carla Szfarek testified for the prosecution that defendant was present at the Denny's restaurant on the evening of her initial contact with Paul Toledo. Defendant had been at a table with Gregory Duerr and another individual named Denny Reynolds when Szfarek told Duerr that Toledo wished to speak with him about buying cocaine. During this conversation, however, defendant was engaged in conversation with Reynolds. Szfarek also testified that Duerr and defendant had been present at her residence at the time she made the October 28 one-gram sale. After that sale, Szfarek had returned inside and given the $100 proceeds to Duerr, informing him that Toledo was interested in making a two-ounce purchase. At 6 p.m. on November 2, defendant had been present at Szfarek's apartment when Paul Toledo came to inquire about the two-ounce purchase. Szfarek had placed a telephone call to John Simpson and handed the telephone to Toledo. Toledo handed the phone to defendant and defendant then asked numerous questions concerning the arrangements for the sale, including whether two ounces of cocaine could be obtained by the following day, the amount of the price, whether defendant should call back and what time. After the call, defendant informed Szfarek that Simpson could only obtain one ounce immediately and would call someone else to see if a second ounce could be obtained by the next day, also that Simpson would call back concerning the price. Szfarek then related the events leading up to her arrest with defendant at the Seven Brothers restau-

rant on November 3 and acknowledged informing Toledo that Duerr wanted $5,000 for two ounces of cocaine, stating that defendant was present during this conversation.

John Simpson, Duerr's roommate, testified that someone called his apartment three or four times on the evening of his arrest asking to speak to Greg. Simpson responded that Greg was not in, "and the next time the phone rang, it was Melanie, and she said that she couldn't get ahold [sic] of Greg, and she wanted to know how much the coke was. That's the one ounce." After Simpson quoted defendant a price of $2,300, she put Paul Toledo on the phone who inquired about the price for two ounces and was told that the price would double. Although the caller identified herself as "Melanie" Simpson did not independently recognize her voice. However, he told her that he had tested the cocaine, "and it was okay." On cross-examination, Simpson was asked about his conversation with defendant "on or about November 2 of 1981" and stated that he could not remember if it was defendant or Paul Toledo who inquired about a two-ounce purchase.

Defendant testified on her own behalf that just before Halloween she had overheard Paul Toledo and Carla Szfarek talking in Carla's apartment. Toledo arrived while defendant was there and told Carla he had tried the cocaine and liked it. Defendant had had a further occasion to visit Szfarek's apartment on November 2 and when she arrived between 5 and 6 p.m. she found Toledo already there. At one point when Szfarek was out of the room, defendant and Toledo had a conversation in which Toledo said that Gregory Duerr's roommate was going to get him some cocaine. This conversation ended when Szfarek entered the room. On the following afternoon, November 3, defendant arrived at Szfarek's apartment between 4:30 and 5 p.m. There was no mention of cocaine during the evening, until about 8:30 or 9 o'clock. At that time, defendant overheard Szfarek talking on the telephone. After Szfarek hung up, she told defendant that everyone was waiting for Toledo to come back with the money. Szfarek then explained that Toledo was going to buy some cocaine from John Simpson and that Szfarek was supposed to bring Toledo to the Seven Brothers restaurant to meet him. Later that same evening, Szfarek received a call from Duerr which caused her to start to cry. Defendant took the telephone from Szfarek and asked Duerr what was going on. Duerr replied that Simpson was threatening him. Simpson himself then came on the line and, expressing impatience with the delay, warned defendant that someone could get hurt. Szfarek, who was worried about Duerr, then asked defendant to accompany her. Toledo

telephoned shortly thereafter, and Szfarek directed him to come to the Golden Bear in Addison at 10 o'clock. Szfarek then called Simpson and informed him that they would eventually meet at the Seven Brothers. Szfarek and defendant proceeded to the latter's car. As they were getting in, Szfarek told defendant, "When we get there, we have to introduce Paul and Greg to each other." Defendant responded, "Okay, *** let's just get over there and get out of here and go."

When they arrived at the Golden Bear, Toledo was late. Toledo's car, containing Toledo and Detective Tellone, pulled up to defendant's car, and Szfarek told the two men to follow them to the Seven Brothers. Upon arriving at this second restaurant, Szfarek told defendant to approach Toledo and say that Szfarek was looking for Duerr. Defendant complied, but as she started to walk away, Duerr came up to Toledo's car and she then went to find Szfarek and told him that she did not wish to stay near the scene of so many threats. Defendant walked back to Toledo's car and asked where Duerr was and as she started walking away, Duerr and John Simpson approached Toledo's car. Defendant returned to her own vehicle and was arrested.

During cross-examination, defendant acknowledged having made a statement on the night of her arrest in which she said that she had been aware the previous evening that Toledo wanted cocaine and that "Greg and John" were going to get it for him. She further stated that she knew Tellone and Toledo were at the Golden Bear to make a cocaine transaction, but denied knowing the agreed upon price.

Defendant contends first that the trial court erred in permitting Robert Baldwin, chief forensic chemist in the Du Page County sheriff's office crime lab, to render an expert opinion on the nature of the alleged controlled substance. She argues that the procedure employed by Baldwin in testing the substance, which utilized a comparison of tracings prepared by an infrared spectrophotometer, denied defendant her constitutional rights of confrontation and cross-examination. Baldwin testified in trial that he compared tracings obtained by testing the alleged controlled substance with results obtained from a known standard and from a standard laboratory chart. As a result of this comparison, it was Baldwin's opinion that the substance contained in the envelope obtained from Simpson was cocaine. Although she acknowledges that an expert is permitted to give an opinion based on reliable standard data and publications, defendant challenges both the use of the standard substance and the published chart as a basis upon which an expert opinion could be founded.

With respect to the published chart, defendant argues there was

no testimony to establish who prepared the chart or how it was prepared. However, Baldwin identified the chart as an infrared spectrum of cocaine free base obtained from the Drug Enforcement Association [*sic*] which had been maintained in the laboratory for approximately five years. Defendant asserts it was improper to admit testimony based on this chart in the absence of any evidence to establish its reliability.

Defendant raises a similar challenge to the comparison made by Baldwin to the standard sample on the grounds that the standard, though kept in the lab in the manufacturer's bottle, had been purchased prior to Baldwin's employment and was not kept sealed. However, Baldwin testified that the standard had been obtained from Merck Chemical Company, and that the infrared spectra that he obtained from testing that sample did not exhibit any "extraneous peaks indicating contamination." This answer, however, depended upon his comparison of the tracing from testing the standard substance with the graph obtained from the DEA. Defendant further posits that the tracings themselves may be unreliable as the spectrophotometer had not been examined or serviced since its purchase earlier in 1981. Baldwin denied that the machine was in need of service, saying he had detected no malfunctions.

Based upon her survey of the cases governing the admissibility of laboratory analyses (*People v. Vance* (1979), 74 Ill. App. 3d 446, 393 N.E.2d 91; *People v. Brannon* (1978), 59 Ill. App. 3d 531, 375 N.E.2d 840; *People v. Bertram* (1977), 45 Ill. App. 3d 70, 358 N.E.2d 1357), defendant contends that the identity of a chemical test standard substance will be accepted only where circumstances tend to indicate the reliability of the standard. Among the *indicia* of reliability which defendant would require are multiple comparisons to the standard, demonstration of precautionary steps to preclude the standard's contamination and demonstration that the spectrophotometer has been determined to be in proper working order.

■■ ■ In Illinois, chemical analysis of a suspected controlled substance will not be held invalid solely because of the speculative possibility that the substance being analyzed could have been contaminated. (See *People v. Vance* (1979), 74 Ill. App. 3d 446, 393 N.E.2d 91.) Further, it is not required that the chemical analyst independently determine for himself the reliability of every instrument being utilized in the examination process or of the standard substances used for comparison with the suspected controlled substance. (*People v. Brannon* (1978), 59 Ill. App. 3d 531, 534, 375 N.E.2d 840, 842.) With respect to the standard chart, Mr. Baldwin testified that it was pub-

lished by the Drug Enforcement Association, and the court may well have interpreted this response as referring to the Drug Enforcement Administration, an agency of the Federal government. In any event, the court may have inferred that published reference works by a group whose name implies an interest in drug enforcement questions and which is distributed to laboratories was sufficiently reliable, in the absence of any contrary evidence, to be used as the basis for analysis of an unknown substance. Similarly, the trial court may have found the standard sample sufficiently reliable given that it was originally supplied by a recognized pharmaceutical company (compare *People v. Brannon* (1978), 59 Ill. App. 3d 531, 534, 375 N.E.2d 840, 842, with *In re T.D.* (1983), 115 Ill. App. 3d 872, 450 N.E.2d 455 (substance obtained from reputable source in original container properly found to contain substance stated on label)); that it was thereafter kept in a crime laboratory; that it was used for the purposes of analyzing suspected controlled substances and that it produced a spectrophotometer tracing comparable to the published chart. Moreover, Baldwin testified that the tracing produced by this substance failed to indicate any contamination. In view of the mutually supporting results of the field test, the results of Baldwin's microscopic analysis of the substance and the virtual identity of the spectrophotometer tracings from the substance being tested, the standard and the published chart, we conclude there was a proper basis upon which the expert witness was permitted to state his conclusion that the substance in question was cocaine.

We also reject defendant's attack upon the reliability of the spectrophotometer itself in view of the fact that the machine was purchased a relatively short period of time before these events, and that Baldwin was unaware of any malfunction or need for service of the instrument. Moreover, while the spectrophotometer was not tested immediately before the examination in question here, the machine is tested periodically.

Defendant next asserts that the weight of the controlled substance was a necessary element of the offense and was not proved.

Robert Baldwin, the State's forensic chemist, testified that the weight of the substance in question was ascertained through the use of a single pan triple beam balance scale which will measure to a hundredth of a gram and had been used by him thousands of times; the scales are tested about once a month using standard calibration weights. He testified the substance in this case weighed 52.4 centigrams. Although defendant objected to this testimony in her post-trial motion, no objection was made at trial, and this issue has accordingly

been waived on appeal. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.

■ In considering the issue for plain error, we cannot conclude that the admission of this evidence was materially erroneous and prejudicial to the accused's substantial rights. This case does not involve a scale for the weighing of large objects (*cf. People v. Fair* (1965), 61 Ill. App. 2d 360, 210 N.E.2d 593 (weight scale for trucks bearing decal showing recent inspection)), nor potentially sensitive electronic equipment (*Village of Schaumburg v. Pedersen* (1978), 60 Ill. App. 3d 630, 377 N.E.2d 252 (traffic radar)), which require periodic official certification or testing at the time of each use. There was no evidence in the present case that the scale was inaccurate, nor did the testimony establish that testing of the scale needed to be done more often than once a month to insure its accuracy. Accordingly, we find no error, plain or otherwise, in the admission of Mr. Baldwin's evidence concerning the weight of the substance.

Defendant next raises two challenges to the sufficiency of the evidence. She first contends that, as a matter of credibility, the evidence against her was so palpably contrary to the weight of the evidence, and so unreasonable, improbable or unsatisfactory that her conviction was not established beyond a reasonable doubt.

Defendant points to contradictions between the testimony of the State's witnesses regarding the number, sequence and contents of her telephone conversations with Duerr and Simpson. She further questions the reliability of Carla Szfarek's testimony in light of what defendant views as its inconsistencies, the witness' bias and the lack of independent corroboration of Szfarek's account of the events. Defendant raises similar contentions with respect to the testimony of Paul Toledo.

■ Defendant is correct that the testimony of Toledo, Szfarek and Simpson concerning the details of the purported telephone conversations cannot be totally reconciled. Despite the inconsistencies, however, all three witnesses testified that defendant had telephone conversations in which she discussed the arrangements for the sale of cocaine. This testimony was corroborated not only by defendant's admission that she was aware before departing from the Golden Bear that Toledo was going to purchase cocaine from Simpson, but by testimony from Detective Tellone that when defendant approached Toledo's car near the Golden Bear she informed him of the price, quantity and the location for the actual sale. In view of the totality of the evidence, the inconsistencies in the testimony of prosecution witnesses may be deemed to be minor or immaterial, going only to the weight

to be given to that testimony. We conclude that the evidence was not insufficient as a matter of law to sustain defendant's conviction. *People v. Kester* (1979), 78 Ill. App. 3d 902, 907, 397 N.E.2d 888, 892; *People v. Henderson* (1976), 36 Ill. App. 3d 355, 367, 344 N.E.2d 239, 249.

Defendant contends finally that the evidence was insufficient to establish her guilt under principles of accountability. In support of this assertion, defendant appears to contend that the prosecution must establish the commission of a specific criminal act by the defendant before accountability may be found. Here, where defendant possessed neither the contraband nor the money, and where the drug sale assertedly would have occurred whether or not defendant was present, she concludes that the evidence failed to establish either her participation in the crime or her intent to facilitate its commission.

In order to hold a defendant accountable for the conduct of another, the State must prove beyond a reasonable doubt that: (1) defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) this participation must have taken place either before or during commission of the offense; and (3) it must have been with the concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Bunting* (1982), 104 Ill. App. 3d 291, 432 N.E.2d 950; *People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) Mere presence at the scene of a crime, even with knowledge that a crime is being committed, or negative acquiescence is not enough to make a person a principal. It is not necessary, however, to prove that the defendant participated in the commission of the act which constituted the offense. (*People v. Tyler* (1979), 78 Ill. 2d 193, 399 N.E.2d 975.) Evidence of conduct showing a design on the part of the defendant to aid in a crime renders the defendant accountable for the perpetrator's actions. (*People v. Rodgers* (1978), 58 Ill. App. 3d 719, 374 N.E.2d 721.) A person may aid or abet without actually participating in the overt act or acts, and evidence that the accused attached herself to a group bent on illegal acts with knowledge of its design supports the inference that she shared the common illegal purpose and will sustain her conviction as a principal for a crime committed by another in furtherance of the venture. *People v. Wright* (1976), 43 Ill. App. 3d 458, 357 N.E.2d 224.

In deciding whether defendant abetted the commission of the delivery of cocaine, the trial court was entitled to consider not only her presence at the scene of the crime (*People v. Bunting* (1982), 104

Ill. App. 3d 291, 432 N.E.2d 950), but also her failure to oppose or disapprove its commission and her close affiliation with others known by her to be involved in the crime (*People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714). Indeed, the court may well have considered that defendant, in conveying information concerning the arrangements for the sale at the Golden Bear, when Szfarek was afraid or unwilling to do so, attached herself to the common venture and sought affirmatively to promote its success. Although she refers to threats being made by those supplying the cocaine for delivery, she had not raised a compulsion defense. Under these circumstances, we conclude that she was properly held accountable.

Accordingly, the judgment of the circuit court will be affirmed.

Judgment affirmed.

REINHARD and VAN DEUSEN, JJ., concur.