THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR HARRIS et al., Defendants-Appellants.

First District (1st Division) Nos. 1—87—0376, 1—87—0487 cons.

Opinion filed March 30, 1990.

Randolph N. Stone, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant Victor Harris.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant Paul Hickombottom.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, William D. Carroll, and Laura J. Diamant, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Victor Harris, Paul Hickombottom (defendants) and Oliver Weekly were charged by indictment with murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)(2)), felony murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)), armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)), and armed violence (Ill. Rev. Stat. 1985, ch. 38, pars. 33A—2, 18—2(a)). Prior to trial, the State dismissed the murder and armed violence charges against defendants and the trial court granted Hickombottom's motion for severance from Harris. Following Hickombottom's and Harris' separate but simultaneous jury trials, defendants were found guilty of felony murder and armed robbery. The trial court

merged the lesser-included offense of armed robbery with the felony murder conviction, and Harris was sentenced to 25 years' imprisonment; Hickombottom was sentenced to 40 years' imprisonment.

On defendants' consolidated appeal from their convictions and sentences, Harris contends that (1) he was not proved accountable for felony murder and armed robbery beyond a reasonable doubt; (2) he was denied a fair trial because the trial court improperly emphasized the murder and accountability instructions at trial; (3) he was denied a fair trial as a result of improper prosecutorial comments at trial; and (4) his 25-year sentence is excessive. Hickombottom contends that (1) he was denied his right to an impartial jury and (2) his 40-year sentence is excessive.

We affirm.

On February 28, 1986, at approximately 9 p.m., the victim, Jose Moreno, died of a gunshot wound to the chest. No money was recovered at the scene of the crime or from the victim's personal belongings.

For brevity, and since much of the evidence overlaps, the evidence adduced at both trials which is pertinent to defendants' appeals will be detailed here together, even though each jury heard only the evidence pertinent to the defendant on trial before it.

The State introduced the following evidence: Detective Robert McGuire of the Chicago police department testified that on February 28, 1986, at approximately 9 p.m., he was assigned to investigate Moreno's murder. He arrived at the crime scene, "canvassed" the area, and obtained the name of defendant Victor Harris.

After proceeding to Harris' apartment, located at 6028 South Wabash in Chicago, McGuire arrested Harris. While being transported to the "Area One" police station, Harris was given his *Miranda* rights. Upon arriving at the police station at approximately 12:30 a.m. on March 1, 1986, and after Harris was again given his *Miranda* rights, McGuire interviewed Harris regarding the "robbery-murder" that had occurred. Harris stated that he had no knowledge of the crime and did not know the victim. McGuire informed Harris that the victim was seen in Harris' building earlier that evening, at which time Harris stated: "All right. I will tell you the truth." Thereafter, Harris gave McGuire an oral statement. Harris' statement indicated the following.

Harris agreed to allow the victim, Tony Chavez and Paul Hickombottom to use his apartment for a drug distribution operation. In turn, he would receive $30 per day. On February 28, 1986, the victim, Chavez and Hickombottom were at his apartment. The victim left Harris' home, but returned at approximately 6 p.m. with a supply of

narcotics, which were to be sold from Harris' apartment. Chavez paid the victim for the drugs, and the victim left the apartment, but returned shortly thereafter bleeding from the head. The victim stated that somebody tried to rob him downstairs. Hickombottom whispered to Harris that it was Weekly who had attempted the robbery.

Defendants left Chavez and the victim at the apartment, and they proceeded to Hickombottom's mother's apartment in the victim's car. Upon their arrival, Hickombottom informed Harris that they were going to "stickup" the victim for his money, that it was Weekly who had attempted to rob the victim, and that he did not think Weekly would utilize a toy gun. Defendants left the apartment in search of a gun and later encountered a person known as "Do-Do," who gave Hickombottom a .22 caliber revolver. Hickombottom then gave Harris the gun. Defendants returned to Hickombottom's apartment, where they met Weekly. Harris gave Weekly the gun and they all left in the victim's vehicle.

While driving, Hickombottom requested Harris' help in "sticking up" the victim, and Harris responded that Chavez told him that the victim would have approximately $1,700 in his possession. Before returning to Harris' apartment, defendants dropped Weekly off at 61st and State Streets in Chicago so that he could hide at 61st and Wabash Streets.

Once inside the apartment, Hickombottom stated, "All right. I'm ready to go and I will walk you down," at which time the victim and Hickombottom exited the apartment. A short time later, "[Hickombottom] came running up the stairs," stating, "They shot him."

After the paramedics and police left the crime scene, Harris drove Chavez home in his car and Hickombottom left in the victim's car. Harris met Hickombottom at Hickombottom's apartment, after he drove Chavez home, and they proceeded together in the victim's car to Weekly's apartment. There, Weekly returned the gun to Hickombottom and they split the money that was taken from the victim. Harris received $50 from Weekly and $60 from Hickombottom for his help.

While driving back to Hickombottom's apartment, Weekly and Hickombottom discussed the possibility of purchasing a television, a video cassette recorder and a stereo. Hickombottom stated that "[he] saw the guy with his hands in the air." Weekly replied that "I knew you wanted to shoot him." Subsequent to arriving at Hickombottom's apartment, Harris picked up his girl friend, Johnice Singleton, and they returned to his apartment.

McGuire further testified that he recovered $110 from Harris and

that Harris assisted him in arresting Weekly and Hickombottom. Harris informed McGuire that he could find the victim's car at Hickombottom's residence, an apartment building located at 6565 South Yale, in Chicago. He also stated that McGuire could locate the gun used to commit the crime in Hickombottom's apartment, No. 42, "in a night stand, under a television, in the first bedroom to the left."

When McGuire arrived at Hickombottom's apartment building, he had occasion to observe the victim's parked vehicle. The vehicle was placed under surveillance. A short time later two men and one woman exited the building and entered the victim's vehicle, at which time McGuire stopped the vehicle and ordered all three passengers to exit the car. Hickombottom was among the passengers in the car, but identified himself as "Paul Hassleway." Also present in the vehicle was Hickombottom's girl friend, Renee Williams, and an individual named Arthur Wyatt. Subsequently, McGuire entered apartment 42 and recovered a .22 caliber revolver from a night stand underneath a television set. Harris thereafter accompanied McGuire to an apartment located at 2961 South Dearborn Street in Chicago. Upon their admission to the apartment, they located Weekly, who was hiding under a bed, and arrested him. Weekly was transported to the "Area One" police station in a squad car, after which the squad car was searched and a hooded, black mask was recovered. After Weekly's arrest, Detective James O'Connell of the Chicago police department recovered a television set and a video cassette recorder from the apartment located at 2961 South Dearborn Street.

Assistant State's Attorney Kevin Horan testified that on March 1, 1986, he obtained court-reported statements from Harris, Hickombottom, and Weekly after informing these individuals of their *Miranda* rights.

Harris' court-reported statement, which was read to and signed by defendant, was substantially similar to his oral statement given to Detective McGuire. His court-reported statement further disclosed the following: Harris was acquainted with Hickombottom for approximately two months and knew the victim only for a period of three to four days when Hickombottom inquired into the drug distribution plan. The victim dropped Hickombottom off at Harris' apartment, but did not come in the apartment until approximately 6 p.m., at which time he returned and received $1,700 from Chavez for drugs. Upon leaving Harris' apartment, the victim was attacked and returned to the apartment bleeding from his head. The victim stated that somebody had attempted to rob him with a toy gun.

Hickombottom subsequently called his friend "Do-Do" and asked

him for a pistol. Do-Do never arrived with a gun, so Harris and Hickombottom left the apartment and drove around in the victim's car looking for Do-Do. Prior to leaving the apartment, Hickombottom told Harris that he "wanted to stick [the victim] up [because] he was a coward" and that he would "give the money up without a fight." After locating Do-Do, Hickombottom was given a .22 caliber revolver, and he and Harris proceeded to Hickombottom's apartment, where they met Weekly.

Harris, Hickombottom and Weekly drove back to Harris' apartment, located at 6028 South Wabash in Chicago. Hickombottom discussed with Weekly a plan to rob the victim of his money. As part of the plan, Hickombottom allowed Weekly to exit the vehicle at 61st and State Streets or 61st and Wabash Streets because Weekly was going to commit the actual stickup.

Hickombottom's court-reported statement, which he signed following minor corrections, disclosed the following: Hickombottom stated that Weekly telephoned him to discuss the possibility of robbing the victim. Hickombottom stated that the victim "seemed like a coward," and that Weekly should go ahead and rob him. Sometime later, Weekly telephoned Hickombottom at Harris' apartment, at which time Hickombottom told Weekly that he saw the victim get some money from Chavez and that he was "probably on his way." After the victim exited the apartment, he returned shortly thereafter, stating that somebody had attempted to rob him but that they were unsuccessful. Hickombottom and Harris left in the victim's car and, after stopping at Hickombottom's mother's house, arrived at Hickombottom's apartment. On the way to the apartment they met Do-Do, who gave Hickombottom a .22 caliber revolver. Hickombottom, in turn, gave the gun to Harris. At Hickombottom's apartment he met Weekly. Weekly informed Hickombottom of his "tussle" with the victim.

Hickombottom, Harris and Weekly proceeded to the victim's car and drove to Harris' apartment. While in the car, Weekly told Hickombottom that "[h]e was going to try again *** just to show the [victim] that he was a coward." Weekly exited the vehicle prior to reaching Harris' apartment. Once inside the apartment, the victim requested Hickombottom to walk him downstairs. "When the victim got halfway to his car he said he was okay, at which time Weekly jump[ed] out, *** over the fence with the .22 caliber revolver in his hand and wearing a black hooded mask." Weekly and the victim tussled. Hickombottom noticed the victim's hands were in the air, heard a shot, and observed the victim grab his chest.

Approximately 30 minutes later, Weekly telephoned and told Hick-

ombottom that "I got everything and, you know, I am at home." After this telephone call, Hickombottom, Harris and Chavez went to Hickombottom's apartment in the victim's car. They left the victim's car and then drove Chavez home in Harris' car. They then proceeded to Weekly's house and "split the money," with Hickombottom receiving $830 and Weekly $860. Harris received $50 from Weekly and $60 from Hickombottom. Weekly gave the gun to Harris, who later, at Hickombottom's apartment, put the gun under a television set. With a portion of the money, Hickombottom bought a video cassette recorder and stereo equipment.

Chavez testified at trial that the victim arrived with a drug delivery on February 28, 1986, and that he gave the victim $1,750 as payment for the drugs. The victim left the apartment with the money, but returned shortly thereafter with blood on his head. Hickombottom and Harris left in the victim's car and returned approximately one hour later. Hickombottom escorted the victim out of the apartment and came "up a few minutes later and said that [the victim] had been shot." During the shooting Harris remained inside the apartment. Chavez, Hickombottom and Harris went to Hickombottom's house in the victim's car. Subsequently, Hickombottom and Harris drove Chavez home in Harris' car.

Howard Reid testified that he had known Hickombottom for approximately 10 years, that he had known Weekly for approximately 8 to 10 years, and that he had been introduced to Harris through Hickombottom. On February 21, 1986, Hickombottom telephoned him and discussed with him the possibility of robbing a "Spanish guy" and the fact that it would be "easy" because the guy did not carry a gun. Reid told Hickombottom that he would have to speak to Weekly, and Hickombottom responded that Reid should forget it because Reid was scared.

Dr. Eupil Choi testified that the victim died of a gunshot wound to the chest and that he performed an autopsy, which disclosed a small abrasion on the victim's forehead, but not any abrasion to the back of the victim's head. Choi further testified that the abrasion on the victim's forehead could have been caused by the victim falling facedown after being shot.

Harris testified on his own behalf and related the same testimony as set forth above except for the following variations: After the victim was attacked the first time, the victim stated that he needed a gun. Hickombottom and Harris left in the victim's car, met Do-Do, who gave Hickombottom a gun, and they returned to Hickombottom's apartment, where Weekly was waiting. Weekly and Hickombottom

went into a bedroom for approximately "ten [or] twenty minutes," and all three individuals subsequently left together. While driving in the car, Hickombottom told Harris to give Weekly the gun and Harris complied. Harris was unable to hear the contents of a two-way conversation between Hickombottom and Weekly. Hickombottom then dropped Weekly off at a bus stop on 61st and State Streets, and Harris and Hickombottom proceeded to Harris' apartment. Harris received $60 from Hickombottom as payment for using his apartment to sell drugs and $50 from Weekly as a loan. He was unaware of any plan to rob the victim until after the commission of the offense.

Hickombottom did not testify at trial.

■■ Addressing first Harris' contentions on appeal, Harris contends that he was not proved accountable beyond a reasonable doubt for felony murder (Ill. Rev. Stat. 1987, ch. 38, pars. 5—2, 9—1(a)(3), 10—2(a)). Pursuant to the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1987, ch. 38, par. 1—1 *et seq.*):

> "[a] person is legally accountable for the conduct of another when:
>
> * * *
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1987, ch. 38, par. 5—2.)

Under this section, "the State must prove beyond a reasonable doubt that: (1) the defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) this participation must have taken place either before or during the commission of the offense; and (3) it must have been with the concurrent, specific intent to promote or facilitate the commission of the offense." (*People v. Cooper* (1987), 164 Ill. App. 3d 734, 738, 518 N.E.2d 260, 263.) Mere presence at the scene of a crime and knowledge that a crime is being committed is insufficient to establish guilt. (*People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520.) It is not necessary, however, that the State prove that the defendant participated in the commission of the act which constituted the offense. (*People v. Tyler* (1979), 78 Ill. 2d 193, 399 N.E.2d 975.) The State need only show that the accused attached himself to a group bent on illegal acts with knowledge of its design, thereby supporting the inference that he shared the common illegal purpose. (*People v. Schlig* (1983), 120 Ill. App. 3d 561, 458 N.E.2d 544; *People v. Feierabend* (1981), 98 Ill. App. 3d 731, 424 N.E.2d 765; *People v. Wright* (1976), 43 Ill. App. 3d

458, 357 N.E.2d 224.) Proof of a common design can be drawn from the circumstances surrounding the commission of the act. *People v. Kelly* (1980), 89 Ill. App. 3d 400, 411 N.E.2d 1012.

■ In determining the sufficiency of the evidence here, we are mindful that a reviewing court will not substitute its judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 461, 467; see also *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) Upon judicial review, the evidence is considered in the light most favorable to the prosecution. *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.

Harris argues that he cannot be held accountable for the victim's murder because he was a mere "bystander" to the crime, Hickombottom's plan to rob the victim did not inculpate him, and no evidence exists to show that he knowingly aided, abetted or facilitated the armed robbery which led to the victim's death. We find this argument unavailing as sufficient evidence exists here to establish Harris' guilt.

Chavez testified that he and Harris were in Harris' apartment during the shooting. Harris admitted in his pretrial statements that Hickombottom informed him that Weekly had attempted to rob the victim with a toy gun and that, while he and Hickombottom were at Hickombottom's mother's home, Hickombottom informed him that "they were going to stickup [the victim] for his money." Defendants together obtained a .22 caliber revolver. Hickombottom gave the gun to Harris, who subsequently handed the gun to Weekly. Hickombottom requested Harris' assistance in "sticking up" the victim, and Harris responded that the victim would have approximately $1,700 in his possession. Harris' statements further disclosed that, before returning to his apartment on the night of the murder, he, Hickombottom and Weekly discussed the method in which Weekly was planning to stick up the victim. "[Hickombottom] was going to walk him downstairs and [Weekly] was going to run out and [tell] him to hold it and [Hickombottom] was going to run up toward his car." Finally, Harris admitted that the plan was partially his idea and that he received $50 from Weekly and $60 from Hickombottom for his assistance.

Although Harris testified at trial that it was his belief that the search for the gun was for the victim's protection and that he was unaware of the plan to rob the victim until after the commission of the offense, it was entirely proper for the jury to assess the credibility of

Harris' testimony and to weigh the evidence (see *People v. Adams* (1984), 129 Ill. App. 3d 202, 472 N.E.2d 135), and we will not substitute our judgment for that of the jury.

■ Based upon the above evidence, we find sufficient evidence to establish beyond a reasonable doubt that Harris aided and abetted Hickombottom and Weekly in participating in the plan prior to the commission of the robbery and that Harris had the concurrent, specific intent to facilitate the commission of the offense. (See *Cooper*, 164 Ill. App. 3d at 738, 518 N.E.2d at 263; see also *Schlig*, 120 Ill. App. 3d 561, 458 N.E.2d 544; *Wright*, 43 Ill. App. 3d 458, 357 N.E.2d 224.) The evidence supporting the above is not so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify reversal of Harris' conviction. Harris attached himself to two individuals bent on illegal acts with knowledge of its design, and, therefore, an inference exists that he shared the common illegal purpose to rob the victim.

Equally without merit is Harris' contention that prejudicial error occurred during jury deliberations. During deliberations, the jury delivered the following note to the trial court:

"If a person is legally accountable for the armed robbery, can they be guilty of murder?"

The court responded to the note as follows:

"Please read the instruction that begins '[t]o sustain the charge of murder ....' At the same time, read the instruction that begins '[a] person is legally responsible for the conduct of another person....' "

Defendant argues that he was denied a fair trial because the trial court improperly emphasized the murder and accountability instructions.

■ Our supreme court established in *People v. Pierce* (1974), 56 Ill. 2d 361, 365, 308 N.E.2d 577, 578-79, that it is within the trial court's sound discretion to respond to inquiries from the jury. (See also *People v. Heflin* (1978), 71 Ill. 2d 525, 545, 376 N.E.2d 1367, 1375-76; *People v. Queen* (1974), 56 Ill. 2d 560, 565, 310 N.E.2d 166, 168-69; *People v. Wade* (1988), 167 Ill. App. 3d 921, 926, 522 N.E.2d 285, 288, *rev'd on other grounds* (1989), 131 Ill. 2d 370, 546 N.E.2d 553.) A decision within the trial court's discretion will not be disturbed on appeal absent an abuse of discretion. *Heflin*, 71 Ill. 2d 525, 376 N.E.2d 1367; *Wade*, 167 Ill. App. 3d 921, 522 N.E.2d 285; *People v. Glass* (1984), 128 Ill. App. 3d 869, 471 N.E.2d 597; *People v. Baggett* (1983), 115 Ill. App. 3d 924, 450 N.E.2d 913; *People v. Kelly* (1980), 89 Ill. App. 3d 400, 411 N.E.2d 1012.

The record discloses that the jury was confused on the issues of felony murder and accountability. After ascertaining the nature of the jury's confusion, the trial court sought to dispel the confusion by referring the jury to the murder and accountability instructions. The court was advised of the jury's plight and it alleviated the confusion by providing the jury guidance as to matters properly the subject of instruction. The trial court did not abuse its discretion in referring the jury to these instructions.

Harris' reliance on *People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367, is misplaced. *Heflin* involved a trial court's refusal to grant a jury's request that the court rephrase the definition in the jury instruction of "legal responsibility." The trial judge refused to rephrase the definition on the ground that it would unnecessarily emphasize one segment of the instructions. The trial court's decision was upheld by the supreme court as a proper exercise of discretion. (*Heflin*, 71 Ill. 2d at 545, 376 N.E.2d at 1375-76.) Unlike the circumstances presented in *Heflin*, the trial judge here merely made reference to specific instructions which would aid the jury in their quandary.

Harris next contends that he was denied a fair trial as a result of improper prosecutorial comments during closing argument. The first comment defendant urges as improper is the prosecutor's remark that Harris was part of the plan to rob the victim. The prosecutor stated the following:

"Why is he giving [Weekly] a gun afterwards? After he gets the gun, why is he giving it to [Weekly] \*\*\*? Because it is part of the plan. \*\*\*

[Harris] is part of the plan. He says he is part of the plan."

The second statement in issue is the prosecutor's comment that Harris was aware that his apartment was intended to be used as part of the plan to rob the victim. The prosecutor stated:

"You have heard how [Hickombottom] went back and forth, how he contacted people, how he approached [Harris] the day before to use his house to set up [the victim]."

The State contends that any prejudicial effect of the first comment is waived as a result of Harris' failure to object to such comment at trial. Pursuant to our supreme court's holding in *People v. Enoch* (1988), 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124, 1130-31, alleged errors must be objected to both at trial and in a written post-trial motion. Harris failed to object to the first comment above during trial. Moreover, the record discloses that Harris' post-trial motion merely stated that "[t]he Assistant State's Attorney made prejudicial,

inflammatory and erroneous statements in closing argument designed to prejudice the defendant's right to a fair trial." It is deficient in that it lacks any specificity to preserve the alleged errors for review. (See *People v. Thomas* (1983), 116 Ill. App. 3d 216, 219-20, 452 N.E.2d 77, 80.) Accordingly, we find that defendant has waived this issue on review. The plain error doctrine is inapplicable here, as the evidence is not closely balanced, nor is the comment of such magnitude that Harris was denied a fair trial. See *People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091, 1093-94.

■ Even assuming *arguendo* that Harris did not waive any error pertaining to the first comment, Harris' contention that he was denied a fair trial is without merit because the remarks were justified based upon the evidence. It is established that a prosecutor is given a great amount of latitude during closing argument, and the trial court's determination of the propriety of closing argument will generally be followed absent a clear abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 326-27; *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847, 852.) The prosecutor has a right to comment on the evidence and to draw all legitimate inferences deducible from the evidence, even if unfavorable to the defendant. *Weatherspoon*, 63 Ill. App. 3d at 322, 379 N.E.2d at 853.

■ Here the State's comment that Harris was part of the plan was entirely proper based upon the evidence. Harris admitted in his pretrial statement to Assistant State's Attorney Horan that it was part of the plan to drop Weekly off approximately one block from his apartment so that Weekly could rob the victim.

As to the State's second comment, that "[Hickombottom] approached [Harris] the day before to use his house to set up [the victim]," we again find that Harris has waived this issue for appeal as his post-trial motion failed to set forth with specificity the alleged error. (See *Enoch*, 122 Ill. 2d at 187, 522 N.E.2d at 1130; *Thomas*, 116 Ill. App. 3d at 220, 452 N.E.2d at 80.) Waiver exists despite the fact that the comment was objected to at trial. *Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1130.

Assuming *arguendo* that the second comment has not been waived, we nevertheless find that the State's comment was proper based upon the evidence and all the legitimate inferences deducible therefrom. Harris' pretrial statement disclosed that prior to the day of the incident he agreed to allow the victim to set up a drug distribution operation in his apartment. It can reasonably be inferred from the evidence that the drug distribution operation was part of the plan

to rob the victim.

We now turn to Hickombottom's contentions on appeal. Hickombottom first contends that the trial court's refusal to dismiss a prospective juror for cause impaired his right to exercise all of his peremptory challenges, thereby constituting reversible error.

During preliminary *voir dire*, the following colloquy ensued between the trial judge and a prospective juror:

> "THE COURT: Anybody here feel they would not be able to be fair and impartial jurors merely because of the charge itself without regards to anything more?
>
> Yes.
>
> THE JUROR: My father—.
>
> THE COURT: Your name, please?
>
> THE JUROR: Ruth Crofton. Your Honor, I think the fact of error would be very heavy.
>
> I have not been trained to interpret human behavior, people telling in truth in my past. It's been difficult for me to be judgmental.
>
> THE COURT: We'll talk about it."

Subsequently, during *voir dire* the juror stated the following to the trial court:

> "THE COURT: Now you have indicated an immediate family member or close friend has been a victim of a crime?
>
> THE JUROR: My father was murdered.
>
> THE COURT: How long ago was that?
>
> THE JUROR: Nine years.
>
> THE COURT: Was anyone ever apprehended?
>
> THE JUROR: No.
>
> THE COURT: There was no trial or anything of that nature. Would that fact in and of itself bring you to this court with any preconceived notion or feeling of ill will against Mr. Hickombottom?
>
> THE JUROR: No.
>
> THE COURT: Would it have any affect upon your ability to be fair and impartial in this case.
>
> THE JUROR: It might.
>
> THE COURT: In what way?
>
> THE JUROR: I just doesn't know if I can be fair.
>
> THE COURT: Would you as best you possibly can try to put aside that event that happened and listen to this case with an open mind and judge this matter as best you possibly can without regard to what happened in the past.

It is a tough job. Do you think you could do it?
THE JUROR: No.

* * *

THE COURT: Would you be able to follow my instructions at the conclusion of the case?
THE JUROR: Yes.
THE COURT: Aside from what you discussed about your dad's death can you think of any reason you can't be a fair, impartial juror?
THE JUROR: No."

Hickombottom exercised a peremptory challenge and dismissed the juror.

The purpose of *voir dire* is to assure the selection of an impartial jury. (*People v. Jackson* (1977), 69 Ill. 2d 252, 260, 371 N.E.2d 602, 606; *People v. Allen* (1986), 148 Ill. App. 3d 200, 206, 498 N.E.2d 838, 842; *People v. Chamness* (1984), 129 Ill. App. 3d 871, 873, 473 N.E.2d 476, 478-79.) It is within the trial court's broad discretion to conduct and manage *voir dire* (107 Ill. 2d R. 234) and to decide whether to grant a challenge for cause (*People v. Pecina* (1985), 132 Ill. App. 3d 948, 954, 477 N.E.2d 811, 815). Based upon the above dialogue, we hold that the trial judge abused his discretion in failing to dismiss the juror for cause.

■ The juror from the beginning of the trial harbored ill feelings as to the crime of murder as a result of her father's murder. Although the juror indicated at one point her ability to follow the trial court's instructions, she had previously stated that she could not put her father's death aside in determining Hickombottom's guilt or innocence and that the murder of her father "might" affect her ability to be fair and impartial in the instant case. Despite the existence of error, we must next determine whether it was reversible error.

Hickombottom argues that the error was reversible because he was forced to use a peremptory challenge to keep this potential juror from sitting on the jury. Our supreme court addressed this issue and has held that "[w]e can not reverse [a] judgment for errors committed in the lower court in overruling challenges for cause to jurors, even though [the] defendants exhausted their peremptory challenges unless it is further shown that an objectionable juror was forced upon them and sat upon the case after they had exhausted their peremptory challenges." (*Spies v. People* (1887), 122 Ill. 1, 258, 12 N.E. 865, 989, accord *United States v. Tweed* (7th Cir. 1974), 503 F.2d 1127, 1129 (before reversible error can be assessed defendant must show that the use of his peremptory challenges prejudiced his case).) The issue was

more recently addressed in *People v. Washington* (1982), 104 Ill. App. 3d 386, 432 N.E.2d 1020, where a defendant was forced to use a peremptory challenge to exclude a prospective juror. On review it was determined that the trial court abused its discretion in failing to dismiss the juror for cause, but further held that the error was waived because the defendant never indicated to the trial court that he was being forced to accept an objectionable juror, thereby allowing the trial court to cure the alleged error by exercising its inherent power to grant the defense an extra peremptory challenge. *Washington*, 104 Ill. App. 3d at 392, 432 N.E.2d at 1024-25.

Similarly situated, Hickombottom has not shown any prejudice here. Hickombottom never informed the trial court that he was being forced to accept an objectionable juror because of the trial court's refusal to excuse the juror for cause. We therefore hold that the error in denying the challenge for cause was harmless.

We next address Harris' and Hickombottom's contentions that their sentences are excessive.

■ While Supreme Court Rule 615(b)(4) (107 Ill. R. 615(b)(4)) allows a reviewing court to reduce the sentence imposed by the trial court, this power should be exercised only when there has been an abuse of discretion and such action is required. (*People v. Villa* (1981), 93 Ill. App. 3d 196, 203, 416 N.E.2d 1226, 1232.) Moreover, it is well established that it is not the function of a reviewing court to serve as a sentencing court and that, absent a clear abuse of discretion by the trial court, a sentence will not be disturbed upon review. *People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 547; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884; see also *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641.

The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11; see also *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 648, 364 N.E.2d 491, 494.) A proper balance must be struck between the protection of society and the rehabilitation of the defendant. (*Cox*, 82 Ill. 2d at 280, 412 N.E.2d at 547.) A judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and such a judgment depends upon many factors, including defendant's credibility, demeanor, general moral character, mentality, social environment, habits, prior criminal history and age. *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.

■ We apply the above-established principles here. Harris argues the trial court "lost sight of the goal of rehabilitation and instead em-

phasized the need for retribution during sentencing." The offense of murder mandates a statutory prison term of not less than 20 years and not more than 40 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(1).) Harris' sentence, which is five years over the minimum sentence of 20 years, is clearly within the statutory limits prescribed by the legislature. Furthermore, the record discloses that sentence was imposed only after the trial court considered all of the factors presented in aggravation and mitigation of the offense, as mandated by the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.1, 1005—5—3.2). We therefore hold that the trial court did not abuse its discretion in sentencing Harris to 25 years' imprisonment, as the sentence imposed is not at great variance with the spirit and purpose of the law or greatly disproportionate to the offense. See *People v. Hayes* (1979), 70 Ill. App. 3d 811, 831, 388 N.E.2d 818, 833.

Hickombottom contends that his 40-year sentence is excessive and unfairly disparate to the 36-year sentence received by Weekly.

The record reveals that the trial judge was fully aware of all of the factors presented in aggravation and mitigation of the offense. Hickombottom had prior convictions for voluntary manslaughter, aggravated battery and felony theft. In considering both the protection of society and Hickombottom's rehabilitative potential, the trial court properly determined that, under the facts presented here, Hickombottom's sentence should be the maximum allowed under the corrections code.

Hickombottom's 40-year sentence is also not unfairly disparate to the 36-year sentence received by Weekly. Although a reviewing court must not defend an arbitrary and unreasonable disparity in sentences between similarly situated codefendants, it should not disturb a sentence where the disparity is warranted by differences in the nature and extent of the defendants' participation in the offense, defendants' relative backgrounds, and defendants' potential for rehabilitation. *People v. Godinez* (1982), 91 Ill. 2d 47, 434 N.E.2d 1121; *People v. Spicer* (1987), 158 Ill. App. 3d 699, 511 N.E.2d 235.

 The record discloses that the potential for rehabilitation is much greater for Weekly than it is for Hickombottom. As set forth above, Hickombottom's past convictions include voluntary manslaughter, aggravated battery and felony theft, whereas Weekly's prior criminal history consisted of an aggravated assault conviction. Furthermore, the trial court found that Hickombottom masterminded the crime and stated that "but for Mr. Hickombottom, this crime would never have taken place. He was the one that was the planner, he was the one that went out and found Mr. Weekly. He was the one that

went out and found Mr. Harris."

As to Hickombottom's final argument that the trial court improperly concluded that he was a gang member and used this as a factor in determining his sentence, we believe that the trial court was justified in relying on this factor since the presentence investigation report indicated at one time "[Hickombottom] had been shot in the stomach *** by a *rival gang*." (Emphasis added.) Moreover, prior gang activity may be considered in sentencing a defendant. *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344; *People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285.

For the foregoing reasons, we affirm Harris' and Hickombottom's convictions and sentences.

Affirmed.

O'CONNOR and MANNING, JJ., concur.