THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHESTER NOVAK, Defendant-Appellant.

First District (2nd Division)   No. 1—91—0539

Opinion filed February 23, 1993.

Eugene O'Malley, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Joelle Marasco, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

A jury convicted defendant Chester Novak of aggravated criminal sexual assault. In this appeal, he raises a number of challenges to the propriety of his conviction: (1) whether section 115—10(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(c)) violates the separation of powers provision in the Illinois Constitution; (2) whether the circuit court coerced the jury into its verdict by remarking "it's still early" to two jury notes indicating deadlock and by delaying in its response to a third note; (3) whether the circuit court abused its discretion in denying defendant's challenge to two members of the venire for cause; (4) whether the circuit court abused its discretion in denying defendant's motion *in limine* to bar the State from introducing evidence of alleged acts of sexual misconduct with other children; (5) whether the circuit court abused its discretion in refusing defendant's tendered in-

structions on the charge of aggravated criminal sexual abuse and on the definition of sexual conduct; (6) whether the circuit court abused its discretion in permitting lay witnesses to give opinion testimony in rebuttal; and (7) whether the circuit court erred in giving certain jury instructions. For the reasons that follow, we affirm defendant's conviction.

In November 1989, Illinois State Police Officer Kevin Shaughnessy interviewed J.R.H., then 10 years old, who described defendant's conduct with him from July 1988 through July 1989. Following this interview, defendant was arrested and charged by indictment with one count of aggravated criminal sexual assault, in violation of section 12—14(b)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)).

Prior to trial, defendant filed a motion to exclude testimony of incidents with four other boys on the grounds that (1) the evidence was not relevant, serving only to establish a propensity to commit similar acts; (2) defendant had not been convicted of anything, so this was not "other crimes" evidence, nor did it fall within the exceptions to the general bar against such evidence; and (3) any probative value from the testimony was outweighed by the potential prejudice. He also asked that the statute mandating a particular jury instruction[1] (Ill. Rev. Stat. 1989, ch. 38, par.

---

[1]The statute reads as follows:

"(a) In a prosecution for [certain] sexual act[s] perpetrated upon a child under the age of 13, *** the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.

(c) If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, the nature of the statement, the circumstances under which the statement was made, and any other relevant factor."
Ill. Rev. Stat. 1989, ch. 38, par. 115—10.

115—10(c)) be declared unconstitutional because the circuit court, not the legislature, should decide how to instruct a jury. The court replied:

"The Court sees no problem with 115—10(c). I think any time we look at a section you have to look at the entire section. In this case, the entire section of C where it says that the Jury is instructed that in making a determination it should consider the age, maturity of the child, nature of the statement, circumstances under which the statement was made and any other relevant factors, in the Court's opinion I don't see any problems with it."

Alternatively, defendant requested a hearing on the admissibility of J.R.H.'s out-of-court statements, pursuant to section 115—10(b). The court denied all his motions other than the one for the hearing. After that hearing, the court held that the evidence could be admitted because it found sufficient safeguards of reliability.

During *voir dire*, which the court conducted, one of the venire members was Raymond Maid. After the usual questions, the following colloquy occurred:

"THE COURT: And can you promise and pledge to all parties to follow the instructions that I would give in this case concerning the law of Illinois as it would apply to the case even if you were to disagree with me as to what the law should be?

A. I have moral problems with some of that.

THE COURT: To what extent, sir?

A. Well, I don't know what the instructions would be, and I know what the case is, and I have moral feelings about the case, itself.

THE COURT: Let me ask you this: Do you feel in any way once the charge was read that you had prejudged the case in any way?

A. Well, I wouldn't say that, but I just don't—the whole concept is anger to my thinking.

THE COURT: Let me ask something, I had asked you previously, is there any thing about the nature of the charge before the court that in any way preliminarily disturbs you to the extent you feel you couldn't give both sides a fair and impartial trial?

A. Yes.

THE COURT: And my recall is that your response to that is no?

A. I'm afraid I didn't understand the question.

THE COURT: Well, let me take this—First of all, do you feel in any way you've prejudged the case?

\*\*\*

A. I wouldn't say I prejudged it, but as I mentioned, the concept, I'm not too pleased about that.

\*\*\*

THE COURT: And based on any question that I've asked you or something that perhaps I haven't even brought up, do you know of any reason you can't give both sides a fair and impartial trial by jury, sir?

A. Well, no, other than I have strong feelings of [sic] the matter. Outside of that, no.

THE COURT: Let me ask you, your moral feelings reference wrongdoing or whatever it might be, has it in your opinion at this point brought you to a situation where you feel in any way you can't give both sides a fair and impartial trial or you have in any way prejudged the defendant?

A. I don't believe I prejudged him, no, but the whole concept is very unsavory to me."

Another venire member, Richard Barich, also was subject to the court's *voir dire*, at which the following questions were asked and answered:

"THE COURT: And, sir, is there anything about the nature of the charge before the Court that in any way preliminarily disturbs you to the extent you feel you couldn't be fair and impartial to both sides?

A. Yes.

THE COURT: Nature of that if you would expand on it?

A. I guess I just have a dislike for homosexuality, things of that nature.

THE COURT: Let me ask you this: When I read the charges [sic] yesterday, did you in any way at that time feel that you had prejudged the case?

A. No.

THE COURT: When I read the charge and you had that reaction, would it be fair to say that you[r] reaction was [']if I were to sit as a juror, I would prefer to sit on a different type of case than one of this type,['] would that be a fair statement?

A. Yes.

\*\*\*

THE COURT: And as I defined patience, and I took it step by step, almost as an outline of how a juror would or is ex-

pected to listen before making any final decision, do you have any problems seeing yourself in that role as a juror and exercising such patience before reaching a final decision in this case?

A. Maybe my discontent for the situation would sway my opinion of the charges.

THE COURT: You feel your opinions, whatever they are, have caused you to in any [way to] prejudged [sic] this case?

A. Possibly.

\* \* \*

THE COURT: Based on anything that's been discussed, questions that have been asked, do you know of any reason you can't give both sides a fair and impartial trial by jury as you sit here right now, sir?

A. I may not be able to—

THE COURT: Other than the expressed reservations that you had about the nature of the charge?

A. Yes.

THE COURT: Any other reason?

A. No."

Defendant asked that each of these two jurors be excused for cause. The court refused. It stated that "in the Court's opinion, based on the questioning, I don't see any situation that Mr. Maid, based on the questions that ha[ve] developed in response, the Court's observations, that he should be excused for cause." As for defendant's challenge to Mr. Barich, the court commented, "Court notes that Mr. Barich's a relatively young man, 25, as I see it, note some nervousness, which is not an unusual situation in jury selection. It is somewhat obvious to the Court that Mr. Barich wishes he was someplace else \* \* \*. But Court feels that in the questioning as they were developed, the honest responses of Mr. Barich, one's set out are such that the standards at this point have, in fact, been met \* \* \*." The court later granted defendant's request that the two be excused, apparently as an exercise of his peremptory challenges.

At trial, J.R.H. testified first. Defendant coached J.R.H.'s brother's baseball team, and the boy first met defendant in July 1988 when his brother was at a practice. He next saw defendant at a celebration for his brother's team in September 1988. A few days later, defendant called J.R.H. and asked if he wanted to improve his baseball skills. He agreed, and his mother gave her permission. Defendant then picked up J.R.H. and took him to his "clubhouse," a separate building at his parents' home that contained a bathroom, kitchen, and at least one other room. After watching television for a while, defendant asked

J.R.H. if he wanted to "get better at baseball" and "strengthen [his] neck." When J.R.H. shrugged his shoulders in reply, defendant "choked" him for a few minutes, that is, defendant "put his hand around [J.R.H.'s] neck and pushed up." The two then played on defendant's computer for approximately 30 minutes, after which defendant took the boy home.

Shortly thereafter, defendant called again, and the events were substantially similar. While defendant had his hands around J.R.H.'s neck, the latter said "Stop, stop, please"; defendant replied "just a couple more seconds." Another time, J.R.H. went to a baseball diamond and played with defendant and another child. On yet another occasion, defendant took J.R.H. to the "clubhouse," but all they did was watch television. Later, defendant coached J.R.H.'s brother's basketball team, and J.R.H. often attended as well.

In the spring of 1989, defendant again called and picked up J.R.H. to go to the "clubhouse." After the boy watched television for a while, defendant asked again if he would like to improve his baseball skills. Receiving no reply, defendant blindfolded J.R.H. and tied his hands behind his back. Defendant put a bicycle grip into the boy's mouth, asking him to bite on it "to see how far [his] mouth could go." After taking the bike handle out of the boy's mouth, defendant put in "something softer," by itself at first and then with chocolate on it. Defendant removed the object from the boy's mouth and a few minutes later took off the blindfold; J.R.H. played with the computer and watched television. He tried to find the soft object, but defendant said it had broken so he threw it away.

A short time later, defendant contacted the boy to again "test him for baseball." The events were similar to those described above. This occurred twice more. The second time, defendant again tied the boy's hands behind his back and blindfolded him. Defendant positioned the boy on his side on a platform three feet high, untied his hands, and then lay down next to him. Defendant asked the boy to hug him, which he did, and then defendant began "choking" him while rubbing against him, sweating and breathing heavy, for a couple of minutes. Defendant stopped shortly after J.R.H. asked him to; he removed the blindfold and took the boy off the platform. The boy then watched television and went home. He did not tell his mother "because [he] didn't think it was wrong what [defendant] did." On the next occasion at the "clubhouse," in July 1989, the boy was watching television with defendant when the latter began "choking" him while rubbing his body against the boy and breathing heavily.

Then, on a Friday in mid- or late July, defendant called to ask J.R.H. to sleep overnight. Defendant picked him up and when they arrived at the "clubhouse," they went into the main house for something to eat, and J.R.H. met defendant's parents. After watching television, the two went to bed on "sort of like a couch, a fold-up couch" about a foot off the floor. In the morning, defendant again asked J.R.H. if he wanted to strengthen his neck and began "choking" him even though the boy said no. At the same time defendant rubbed his body against the boy's from the waist down, sweating and breathing heavily, but he stopped when the boy asked him to.

Defendant also asked J.R.H. to stay over the next Friday night. The events that night were similar, but in the morning, when J.R.H. returned from the bathroom, he noticed that defendant had moved toward where the boy had been sleeping. The boy slept a while longer, and when he awoke, defendant asked "would you like a dollar thing or a five dollar thing." Although not knowing what defendant meant, the boy replied "the five dollar thing." When defendant asked the boy if he was sure, he replied he was. Defendant then tied J.R.H.'s hands behind his back, blindfolded him, laid him on the bed on the floor, lay down next to him, and instructed the boy to move down while he moved up, so that the boy's head was at defendant's waist. Defendant "started rubbing something rough on [J.R.H.'s] cheeks," and then defendant pulled down his pants and put his penis in the boy's mouth. After a minute, the boy began crying and told defendant to remove his penis. Defendant said "wait a minute," pulled up his pants, and then removed the blindfold and rope. When defendant asked J.R.H. if he was going to tell anyone, the boy replied "maybe." Defendant also asked if J.R.H. was mad at him, to which he replied "yes." Defendant then told him he too had been molested. Defendant and J.R.H. went to the baseball field to prepare for a game; when J.R.H. saw his mother shortly thereafter, he did not tell her what had happened because he "was embarrassed and afraid." Defendant never called him again.

J.R.H.'s mother testified next. She met defendant in July 1988 when her other son was asked to play on defendant's baseball team. At the end of the summer, defendant asked her if he could interview J.R.H. for "a master's paper he was writing on baseball and young people." Defendant called four or five times to ask if one of the boys was available to come over "to do a little bit more research"; he would then pick the boy up and return him four or five hours later. Ms. H. described J.R.H.'s relationship with defendant as "beautiful, I mean, it was just the greatest, I couldn't believe it, he told me once

he loved him" and "just like a father and a son, they were close friends." The boy always hugged him, and they even had a special handshake. J.R.H.'s brother also played basketball on a team for defendant, but after the season ended, Ms. H. did not see defendant until the spring of 1989, when he called to ask if the older boy could join a baseball team. J.R.H. then went to defendant's house "about nine or ten times" for about four hours each time, to practice baseball and "hang around." Toward the end of July 1989, defendant asked if J.R.H. could stay overnight one Friday night; Ms. H. agreed, and she picked him up at a game the next morning. The next Friday, defendant again asked if the boy could stay over that night; Ms. H. again agreed and again picked him up at a game the next morning at about 9 a.m. She never heard from defendant again.

A few days later, Ms. H. learned of defendant's arrest and asked her children if he had ever touched them; they said no. In October, after a call from the Illinois State Police, she again asked J.R.H. if defendant had touched him, but she did not believe his denial. When she pressed him, he admitted it and began to cry.

J.M., a 14-year-old, testified next. In June 1989, he was playing on a baseball team coached by defendant, who offered to help him work on his throwing ability. After a noon game, defendant took him to the "clubhouse" and took measurements. After looking at baseball items, defendant told him to lie down on the floor on his side. Defendant then blindfolded J.M., saying that it was to prevent distraction by the light, and began pulling on his throwing arm. He then told the boy to lie on his stomach and "connected" and "unconnected" the boy's hands (not tying them), apparently behind him, and lay on top of the boy. For about five minutes, defendant was breathing heavily and moving up and down; J.M. could feel something hard hitting him, which he later said was defendant's penis. Defendant then put one hand under J.M.'s stomach and touched the boy's penis while moving up and down. When J.M. asked defendant to stop, defendant replied "be quiet," ceasing only when the phone rang. Afterward, J.M.'s father called and wanted the boy home. En route, defendant told J.M., "you can't tell nobody what happened or else." Defendant called J.M. at least three times daily thereafter, but J.M. refused to go to defendant's house again. J.M. did not tell anyone about the incident because he was "scared and embarrassed and [he] thought [his] dad would go over there and try to kill [defendant]."

R.N., a 15-year-old, also testified. He too played on defendant's baseball team in 1989, and he too was asked if he wanted to undertake a program to strengthen his throwing arm. His parents would

not allow him to participate, however, until the school year ended. When R.N. went to defendant's "office," defendant took his measurements and had him lie on the floor. At first, he put pressure on R.N.'s neck for only a few minutes. On the way home, defendant told him not to tell his parents what had happened because they would try to interfere with the training. At a later visit, defendant told him not to tell the other team members about the program because they might be jealous. Defendant also said R.N. needed to strengthen his neck and would have to wear a blindfold to allow him to relax and not see lights. The blindfold was covered with a sock and held in place with a rubber band, as was the sock used to tie R.N.'s hands; defendant said that this was done so as not to leave marks. Defendant had R.N. lie on the floor, but then leaned him against a high table and put pressure around the boy's neck, pushing down with his hands and some sort of cord, while defendant leaned against him with his lower body. While this occurred, defendant was breathing heavily and when finished, he was sweating. Afterward, R.N. and defendant talked about the training and the other team members. This occurred three or four times a week, from the beginning of June until mid-August. R.N. never saw a bed, couch or mattress, nor did defendant ever touch R.N.'s genitals or buttocks. R.N. did not speak with his parents about what happened until mid-August, when he read about defendant in the newspaper.

D.P., a 14-year-old, was the last child to testify. He joined defendant's team in May 1989. Defendant told him about a program to strengthen his arm and told him to ask his parents if he could participate. Twice a week during the season, defendant took D.P. to his "office." Defendant showed him pictures of men lying on benches, blindfolded, with other men with hands around their necks, telling D.P. that he would perform this type of exercise. Nothing unusual occurred during the first visit, other than measuring D.P. and putting the data into the computer. On the second visit, however, defendant told D.P. to lie back against the table and he put his hands around D.P.'s neck, pressing hard. Each visit lasted approximately an hour, 30 minutes of which was spent on the training program. On later occasions, defendant blindfolded D.P. (with a headband and a sock) and tied his hands behind his back (with a sock and a rope); occasionally, defendant had him sit in a chair. Defendant's "private parts" were touching him, and his leg was rubbing against the boy during this time. D.P. did not tell his parents because defendant told D.P. not to tell anyone, for the program was an adult one and if he revealed it, defendant would not be able to coach and D.P. would not be able to play baseball. Defend-

ant did not touch D.P. except for the exercises, nor did defendant ask him to lie on the floor.

After his motion for a directed verdict was denied, defendant opened his case with testimony by Michele Smith. She and her family were on vacation at a campground in Michigan during the week before Friday, July 28, 1989, and she remembered that defendant's mother was vacationing there that same week.

Defendant's father testified next, saying that on the morning of July 22, 1989, he and his wife had bought some items in a general store near the Michigan campground, and had a time- and date-stamped receipt showing his purchases. He left the next day, but his wife stayed on. His wife called twice from Michigan on the evening of July 28, at 7 and 9 p.m., as indicated by the phone bill. The only noise he heard that evening was sometime after 10 p.m., when he saw his son and a friend, Mark, and their cars. Mostly, his son slept in his parents' house, staying overnight in the "office" only once or twice a week since he had become active in baseball five years earlier. Mr. Novak never saw any young boys there.

Mark Wojciechowski also testified; he had known defendant for 14 years and in 1989, helped him coach baseball. Occasionally he and defendant slept in the office, either on the floor, the desk, or a chair; there was no bed, mattress or couch. In June and July 1989, they slept there approximately 10 times on Friday or Saturday nights, including the nights of Friday, July 21, and Friday, July 28. Although he never saw defendant put blindfolds on his players, tie their hands, or choke them in the course of exercising them, he recalled that defendant talked about using blindfolds on them in connection with batting.

Defendant also testified. He had a variety of jobs prior to 1989, when he was writing for his own mail order business about coaching baseball. In 1989, he also coached four regular and four tournament teams, spending about 80 hours a week. He also admitted that he was not working on a master's thesis in the fall of 1988.

On July 29, 1989, defendant had a game in Downers Grove; J.R.H. was not at defendant's home the evening before the game, nor was he there the weekend before that. In fact, J.R.H. never had been there overnight. D.P. and R.N. came to his home for a strengthening program that utilized neck exercises from a publication called the Young Athletes Manual, which he told the boys would benefit their throwing; the exercises would also improve their hitting and reduce injuries. He denied instructing the boys not to tell their parents, stating that he told them not to perform the exercises with anyone else because someone might be injured and he would be held responsible. He used blindfolds in the pro-

gram to direct the athletes toward movements and internal feelings to improve their skills, as an article by another coach suggested. The first step in the program was to measure a boy's muscles and get other basic information, after which defendant would compare the information with that of other boys. Defendant then would work on flexibility of the boy's neck and shoulders, with the boy's hands behind his back, which he did with R.N., D.P., and J.R.H., but not J.M. In certain exercises, with the neck extended backwards, a boy might arch his back, bringing his waist forward and causing contact between the boy and defendant; this might also cause difficulty breathing or swallowing. The purpose of the neck exercises was "to create a leverage for the shoulder which is the power base of throwing or both shoulders for the power base of hitting." He denied tying the boys up, saying that he restricted their movements with the sock in order to prevent them from using their hands to push off an object.

Defendant had used the building as his office since 1984 or 1985. J.R.H. was there with him alone only once, in the spring of 1989. J.R.H. was at the main house with him alone in the winter of 1989, but he also had been to defendant's office with other boys. D.P. was there between 6 and 10 times in the summer of 1989; R.N. was there about the same number of times, and J.M. was never there.

Master Sergeant Kevin Shaughnessy of the Illinois State Police testified next. He interviewed J.R.H. on November 6, 1989, at which time the boy said that he had stayed overnight at defendant's "clubhouse" and slept in a bed with him in July 1989; J.R.H. had told him nothing about the bicycle grip, but Shaughnessy said that it was not unusual for young victims of sexual abuse to omit something when he first interviews them.

In rebuttal, the State called Tom Milanovich and Mike Lenti, not as experts in strength training and exercising but as lay people familiar with the field. Defendant objected, but the court allowed them to testify. Milanovich had played professional football in the late '70's and early '80's. He also had played baseball, but only in high school; he never had coached baseball. In 1979, he opened a gym for "serious training clientele" rather than health club habitues, and had been a personal trainer for a few professional baseball players. In his experience, training 10- to 13-year-olds would not include blindfolds, tying their hands behind their backs, or putting pressure on their necks. Furthermore, neck resistance exercises were used for contact sports, not for arm strengthening because the strength of the neck muscles is unrelated to throwing a baseball. Blindfolding too had nothing to do with arm strengthening. He preferred to include parents in training youngsters, not to exclude them.

Lenti played professional baseball for 2½ years and semi-pro baseball for nine years, continuing to play at the time of the trial and coaching a women's softball team as well as serving as assistant athletic director at DePaul University. The muscles used in throwing are those in the arm, back, shoulders, chest, and legs, he observed, stating that "there is no benefit to having an absolute strong neck in baseball" and that too strong or overdeveloped a neck would be "a hinderance more than a help." He never saw anyone train people by using blindfolds or tying their arms behind them. Although not a trainer, in his job at DePaul, he, like Milanovich, trains children occasionally, but he never worked on their necks or advised parents not to attend. He disagreed with the article by the Iowa baseball coach about the advantages of blindfolding. He also described the neck exercises at issue as isometric ones for strength, which is not needed for baseball, rather than for flexibility, which is needed. He conceded that although he did not tell his young trainees not to talk to their parents about the training, he would not tell the youngsters to instruct their parents on the exercises if the parents were not in attendance.

At the jury instruction conference, defendant objected to a number of the State's proffered instructions, including Illinois Pattern Jury Instructions, Criminal, Nos. 3.14 and 11.67 (2d ed. 1981) (hereinafter, IPI Criminal 2d),[2] both of which he had addressed in his pretrial motions. His objections were overruled without comment, other than that the objections were preserved. Defendant tendered only two jury instructions: aggravated criminal sexual abuse and the definition of sexual conduct,[3] on the ground that the evidence supported an instruction on a lesser included offense. The State argued that there was no evidence to support a verdict

---

[2]IPI Criminal 2d No. 3.14, as modified in this case, states as follows:
"Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received solely on the issue of defendant's *modus operandi* or method of acting and his intent. This evidence may be considered by you only for the limited purpose for which it was received."

IPI Criminal 2d No. 11.67 (Supp. 1989), as modified in this case, states as follows:
"You have before you evidence that [J.R.H.] made statements to his mother concerning the offense charged in this case. It is for you to determine whether the statements were made and if so, what weight should be given to the statements. In making that determination, you should consider the age and maturity of [J.R.H.], the nature of the statements, and the circumstances under which the statements were made."

[3]Neither instruction appears in the common law record, but from the rest of the record it appears that they were IPI Criminal 2d Nos. 11.64 and 11.39 (Supp. 1989).

on the other offense, so that if the jury did not believe J.R.H., the only possible verdict was not guilty. Defendant replied that the jury could believe some but not all of J.R.H.'s testimony. If, for example, it believed that no penetration had occurred, it could find him guilty of sexual abuse rather than sexual assault. The court refused the instructions.

The jury retired around 2:30 p.m. Just after 5 p.m., the jury sent out a note. It is not in the common law record, but the court described it as follows: "First line with a dot says 'Testimony of J.R.[H.]' Second dot says, 'What was Novak arrested for?' Third dot, 'Testimony of Novak.' " After a brief discussion, the court sent its own note: "Please continue to use your collective memory. The entire trial transcript of these individuals is not immediately available. Number two, there is no evidence concerning what Mr. Novak was arrested for that you should consider. *** Please continue to deliberate."

An hour later, the jury sent another note. Signed by all the jurors, it stated: "We, the jury, are hung. (Eight jurors vote guilty, two vote not guilty, two are undecided.)." Defense counsel, observing that the jury had been deliberating for four hours, stated: "I ask that their judgment be upheld[.] They are hung." The State replied that "this is nothing more than the natural progression of the jury deliberations. They have been out a long time. I think that they should be required to deliberate a lot longer." The court commented, "In the Court's opinion, it is quite early. We haven't even come anywhere close to where the Court would be receiving any Prim instructions, not having received any other notes or efforts of direction to the jury."[4] The court then sent the jury its reply: "It is still quite early. [P]lease continue in your deliberations, signed Judge Foxgrover." Defense counsel commented: "I simply want to say, for the

---

[4]The *Prim* instruction is as follows:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case." *People v. Prim* (1972), 53 Ill. 2d 62, 75-76, 289 N.E.2d 601, 609, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.

record, I ask that they be Primmed. I ask they simply be told, if there is no other note, for them to continue to deliberate. There is no need to tell them it's early, and it's too early in the process." The court noted the objection.

Two hours later, at 8:15 p.m., the jury sent out yet another note, which read: "Judge Foxgrover, the jurors will not change their mind[s]. The jury is still hung. It doesn't matter how much time is given, for our own personal differences and beliefs and stubbornness we cannot come to a unanimous decision." The State asked for the *Prim* instruction; defense counsel requested again that the jury be given the instructions on the lesser included offense and the definition of sexual conduct. The court again refused defense counsel's suggestion but agreed to read without comment the *Prim* instruction. The court also remarked that "[n]o specific questions have been sent out by the jury for reference on any particular points, requests for transcripts, other than they-send-us-the-whole-transcript type of situation, which I thought was relatively premature, as we discussed earlier." Defense counsel repeated his suggestion that the jury's deadlock be honored.

Commenting "It's still quite early, folks," the court read the instruction twice. After the jury retired once again at 8:32 p.m., defense counsel again objected to the court's remark that it was still early, which in his opinion implied that the jury was obliged to reach a verdict. At 10:45 p.m., the court read another note sent out by the jury: "Judge Foxgrover, the jury still cannot reach a unanimous decision. The temperament of the jurors are [*sic*] violent to individual judgment. The opinions of our jurors will not be changed. 11 vote guilty, 1 vote not guilty. *** The testimony of J.R.[H.] might be beneficial if we can hear it over." The court decided to sequester the jury for the night and arrange for the court reporter to provide the requested testimony the next morning.

Nine minutes later, while the court and the attorneys were discussing the matter, the jury indicated it had reached a verdict. Defense counsel stated his objection that "the note should have been honored instantaneously," but the court demurred, stating that it had to call counsel and arrange sequestration, talk with them, and then make arrangements with the court reporter. The jury found defendant guilty of the single charged crime.

In his motion for a new trial, defendant raised the same challenges he brings here, among others. The court denied the motion.

### I

Defendant's first issue on appeal is a challenge to the constitutionality of section 115—10(c) of the Code of Criminal Procedure of 1963 (Ill.

Rev. Stat. 1989, ch. 38, par. 115—10(c)). Defendant claims that with this statute, the legislature usurps the authority of the judiciary by mandating that the circuit court instruct the jury a certain way. He insists that the Illinois Constitution provides that only the judiciary can exercise judicial power (Ill. Const. 1970, arts. VI, II (judicial power is vested in the courts, and "[n]o branch shall exercise powers properly belonging to another")), and under Supreme Court Rule 451 (134 Ill. 2d R. 451), only the circuit court has the power to decide how a jury should be instructed. Therefore, he reasons, to enact a statute mandating use of a particular jury instruction is an improper exercise of judicial power by the legislature.

■ Our analysis begins with the presumption of the statute's constitutionality and defendant's burden of overcoming that presumption. (*DeLuna v. St. Elizabeth's Hospital* (1992), 147 Ill. 2d 57, 67, 588 N.E.2d 1139, 1143 (rejecting separation of powers challenge to statute requiring medical malpractice plaintiffs to submit a report from a health professional giving grounds for belief that the claim is meritorious).) With regard to the particular constitutional issue here,

> "the separation of powers provision does not create rigid boundaries prohibiting every exercise of functions by one branch of government which ordinarily are exercised by another [citations]. Thus, [the court] ha[s] consistently recognized that the legislature, which is vested with the power to enact laws, may also enact legislation which governs judicial practices, as long as it does not *unduly* infringe upon the powers of the court." (Emphasis in original.) (*People v. P.H.* (1991), 145 Ill. 2d 209, 222-23, 582 N.E.2d 700, 706.)

In this way, courts have found that the legislature may enact statutes governing judicial procedure, such as pleading requirements, so long as the legislature does not pass legislation that conflicts with supreme court rules or that encroaches unduly on the courts' judicial powers under the State constitution. *DeLuna*, 147 Ill. 2d at 69, 588 N.E.2d at 1144, citing *People v. Walker* (1988), 119 Ill. 2d 465, 475, 519 N.E.2d 890.

In *P.H.*, for example, our supreme court was asked to determine whether the "gang-transfer" provision in the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1989, ch. 37, par. 805—4(3.1)), which requires a juvenile court to order prosecution of a minor as an adult if it makes certain findings, constituted an infringement upon the inherent power of the judiciary "to adjudge, determine and render a judgment." The court held that it did not, reasoning that juveniles had no common law or constitutional right to juvenile court adjudication under the Juvenile Court

Act, which it defined as "a purely statutory creature whose parameters and application are defined solely by the legislature," just as the bifurcated hearing procedure under the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 403(e)) was designed to define and implement a statutorily created remedy. *P.H.*, 145 Ill. 2d at 223-24, 582 N.E.2d at 706-07, citing *Strukoff v. Strukoff* (1979), 76 Ill. 2d 53, 389 N.E.2d 1170.

Here, by analogy, the statute at issue created an exception to the hearsay rule for a class of out-of-court statements by children in prosecutions for sexual acts committed upon them, provided that certain conditions are met for reliability. Like the legislative enactments in *P.H.* and *Strukoff*, the statute at issue is in derogation of the common law, albeit evidentiary not procedural, which the legislature could define and then implement, in this case by creating a mandatory limiting instruction.[5] Therefore, we hold that section 115—10(c) does not represent an infringement, much less one that is undue, of the courts' judicial power.

Moreover, although it is true, as defendant suggests, that when a conflict occurs between a statute and a rule, the rule prevails (*O'Connell v. St. Francis Hospital* (1986), 112 Ill. 2d 273, 282-83, 492 N.E.2d 1322, 1326 (conflict between voluntary dismissal statute and Rule 103(b) resolved in favor of the rule); *People v. Bainter* (1989), 126 Ill. 2d 292, 303, 533 N.E.2d 1066, 1070), we find no lack of harmony between Supreme Court Rule 451 and section 115—10. Rule 451 instructs courts that if an IPI instruction exists and is applicable, it must be used so long as it does not misstate the law; if there is no applicable IPI instruction, the court is to give an instruction that is "simple, brief, impartial, and free from argument." (134 Ill. 2d R. 451.) Here, an instruction exists (IPI Criminal 2d No. 11.67 (Supp. 1989) (now IPI Criminal 3d No. 11.66)); it is applicable because J.R.H.'s out-of-court statements had been admitted; and it tracks the language of the statute, so it does not misstate the law. Indeed, the

---

[5]We observe in passing that there is no dearth of like statutes. See, *e.g.*, Ill. Rev. Stat. 1991, ch. 110, par. 8—2601 (same as statute at issue, for civil cases); Ill. Rev. Stat. 1991, ch. 38, par. 9—1(c) (court shall instruct jury to consider any aggravating and mitigating factors relevant to imposition of death penalty); Ill. Rev. Stat. 1991, ch. 38, par. 115—4(j) (court shall separately instruct jury that a special verdict of not guilty by reason of insanity may be returned under certain conditions); Ill. Rev. Stat. 1991, ch. 110, par. 2—1107.1 (in certain negligence or strict liability actions, the court shall instruct the jury that a defendant shall be found not liable if the jury finds that the plaintiff's contributory fault is more than 50% of the proximate cause of the injury or damage).

circuit court would have been remiss under Supreme Court Rule 451 had it *not* given the instruction.

## II

Defendant next characterizes the verdict as "coerced" because (1) the circuit court told the jury "it's still quite early" and did not give the *Prim* instruction at the first indication that the jury was deadlocked; (2) when it finally did give the instruction, the court prefaced it with another "it's quite early" remark; and (3) the court delayed its response to the last note. He asserts that the court's comments that it was early and its lack of immediate response to the last note "could have impelled the jury to believe that it was required to reach a verdict."

The cases defendant cites in support are no help to him. In *People v. Ferro* (1990), 195 Ill. App. 3d 282, 291-92, 551 N.E.2d 1378, *appeal denied* (1990), 133 Ill. 2d 563, 561 N.E.2d 698, for example, the jury foreman told the court at 1:30 a.m. that he did not believe that the jury could reach a verdict after approximately six hours of deliberation. The court replied, "[i]f you are not going to be able to reach a verdict, I am going to house you in a local motel somewhere until this jury does reach a verdict. * * * Do you think you will be able to reach a verdict in the next few minutes, please." The jury then asked for another hour, after which it asked for 10 minutes and then rendered a guilty verdict on one of the two counts. Noting that an instruction to continue deliberating should be "simple, neutral, and not coercive," the appellate court reversed the conviction because the court had not informed the jury of its option to deadlock, stating that "the test effectively turns on a consideration of whether the trial court's instruction imposed such confusion and pressure on the jury to reach a verdict that the accuracy and integrity of the verdict returned becomes uncertain." (195 Ill. App. 3d at 293, 551 N.E.2d at 1385.) The opinion does not mention the *Prim* instruction.

■ The "it's still early" comment here was simple, neutral, and not coercive. It contained nothing to the effect that a verdict was required, implied no pressure, and created no confusion. Instead, it conveyed only reassurance to the jury that it should not expect to reach unanimity in just a few hours and encouragement to continue its deliberations. Such comments are not the stuff of coercion, unlike the court's not-so-subtle threat in *Ferro*, from which a jury likely would infer that it was obliged to reach unanimity, and quickly. In addition, the jury's decision to continue to deliberate for some time after hearing each remark here belies the interpretation defendant urges.

In another case cited by defendant, *People v. Branch* (1984), 123 Ill. App. 3d 245, 462 N.E.2d 868, 11 jurors voted guilty. The one who did not explained that he did not want anyone to go to jail. When apprised of the juror's feelings in a note, the judge told the jury that that juror should not have served and that they would be sequestered in an hour. Ten minutes later, the jury reached its verdict. The appellate court determined that the court's remark likely intimidated the juror by implying that his refusal to join the majority should have disqualified him rather than explaining that the juror was improperly focusing on punishment rather than guilt. The court also noted that the one-hour deadline for sequestration reinforced the pressure on the lone juror to end the inconvenience to his fellows. Here, there were no remarks singling out the unconforming jurors nor did the court give the jury a deadline of any sort. The remarks here are too innocuous to have pressured the jurors who were voting for acquittal, unlike *Branch*, and they did not interfere with the verdict, unlike *Ferro*. Therefore, the verdict was not coerced by the circuit court's remarks.

As for the court's initial refusals to read the *Prim* instruction, in *People v. Cowan* (1985), 105 Ill. 2d 324, 473 N.E.2d 1307, another case cited by defendant, the court did not respond to a similar note sent after four hours of deliberation or to another sent three hours later. The jury was then sequestered and the next morning, after a third note following 45 minutes of deliberation, the court finally informed the attorneys of the notes and gave the *Prim* instruction. Despite the delay, the supreme court held that the circuit court had not abused its discretion in waiting to read the instruction, given the five-day trial on nine "serious" charges, with testimony by 11 witnesses.

As *Cowan* observed:

> "The time when a supplemental instruction should be given is for the court to decide. This court said in *People v. Preston* (1979), 76 Ill. 2d 274, that 'it is primarily the function of the trial court to determine, on the basis of such factors as the length of time already spent in deliberation and the complexity of the issues before the jury, when the giving of the [*Prim*] instruction becomes appropriate.' [Citation.] The trial court has discretion to have the jury continue its deliberation even though the jury has reported that it is deadlocked and will be unable to reach a verdict." 105 Ill. 2d at 328, 473 N.E.2d at 1309.

Courts also look to the time at which the instruction is given and the length of the jury's deliberations after receiving the *Prim* instruction to determine whether the instruction itself had a coercive effect. *Peo-*

*ple v. Edwards* (1991), 218 Ill. App. 3d 184, 201-02, 577 N.E.2d 1250, 1261, *appeal denied* (1991), 142 Ill. 2d 658, 584 N.E.2d 133; see also *People v. Hugues* (1991), 230 Ill. App. 3d 192, 201-02, 595 N.E.2d 1, 7, *appeal denied* (1992), 146 Ill. 2d 639, 602 N.E.2d 464.

The case before this jury was not complex: there was only one charge and few witnesses. The jury had deliberated fewer than four hours before the first note indicating impasse, which the court answered, and only another two hours before the second, after which the court read the *Prim* instruction. The jury then deliberated another two hours before sending a third note indicating that it was hung. Only nine minutes later, before the court had time to respond, it reached its verdict. Given the nature of the charge, the number of witnesses, and the two hours between the jury's first indication of deadlock and the reading of the instruction, we cannot say that the circuit court abused its discretion by not giving the jury the *Prim* instruction after the first note indicating deadlock. In light of the two hours of deliberation after the jury heard the *Prim* instruction, the instruction itself cannot be said to have had a coercive effect on the jury. Lastly, we see no basis, other than rank speculation, for holding that the circuit court's lack of immediate response to the third note, even when coupled with its earlier admonitions that it was early, compelled the jury to believe it was obliged to reach a verdict.

### III

Defendant contends that he has a constitutional right to a fair and impartial jury and that the circuit court abused its discretion in denying his challenges for cause to venire members Raymond Maid and Richard Barrich, both of whom expressed reservations about their ability to be fair and impartial. He adds that the charge concerned a homosexual act, a matter about which a jury's passions might be inflamed, and both men's comments concerned this very aspect of the case. The solution he urges is a remand for a new trial.

Without question, "[t]he law provides that a venireman is incompetent to sit as a juror if he cannot be impartial, and a reviewing court may reverse a conviction where a juror expressed self-doubt concerning his ability to be impartial." (*People v. Delgado* (1992), 231 Ill. App. 3d 117, 120, 596 N.E.2d 149, 152.) Although one court concluded that "there can be no claim of prejudice" if a challenged venire member is excluded by use of a peremptory challenge (*People v. Johnson* (1987), 162 Ill. App. 3d 952, 955, 516 N.E.2d 343, 345), we believe the better rule is that articulated in *People v. Johnson* (1991), 215 Ill. App. 3d 713, 725-26, 575 N.E.2d 1247, 1255, in which the court held

that even if a challenged venire member does not sit as a juror, a defendant may claim prejudice if he was forced to accept another objectionable juror after he had exhausted his peremptory challenges because the court refused to excuse the venire member challenged earlier for cause.

In *Delgado*, for example, the circuit court denied a defendant's challenge of a venire member for cause after the person expressed doubt about his ability to be impartial. The defendant then used a peremptory challenge to exclude that venire member. The appellate court agreed that the circuit court should have permitted dismissal for cause, but it nevertheless affirmed, holding that "[if a] defendant[ ] [does not] indicate to the trial court that he was being forced to accept an objectionable juror because of the court's refusal to excuse [the challenged venire member] for cause[, that defendant] denie[s] the court an opportunity to cure the error thereby failing to establish prejudice to defendant." *Delgado*, 231 Ill. App. 3d at 121, 596 N.E.2d at 153.

■ Here, the doubt expressed by both Maid and Barich indicates the equivocation deplored in *Johnson, People v. Harris* (1990), 196 Ill. App. 3d 663, 554 N.E.2d 367, *appeal denied* (1990), 133 Ill. 2d 565, 561 N.E.2d 699, and *People v. Washington* (1982), 104 Ill. App. 3d 386, 432 N.E.2d 1020. Therefore, the circuit court should have permitted defendant to excuse them for cause. As in *Delgado*, however, it does not appear from the record here, nor does defendant argue, that the circuit court's ruling forced him to squander two peremptory challenges and therefore he had no peremptory challenges remaining when he desired later to excuse a venire member but had no ground for doing so for cause. Absent a demonstration of such prejudice, no reversal is warranted. See also *People v. Martinez* (1992), 242 Ill. App. 3d 915, 928.

## IV

Defendant also contests the admission of testimony by the other three boys, J.M., R.N., and D.P. Although the State had convinced the circuit court that the evidence was admissible to prove *modus operandi* and intent, defendant claims that the testimony did not show a clear connection between the other incidents and the charged crime, nor did the other incidents share the requisite "peculiar and distinctive common features" for use as proof of *modus operandi*. He argues that what the State considers "distinctive features that are not common to most offenses of that type" are "merely irrelevant coincidences," including that all four victims were white, lived in the south

suburbs, were slightly built, and were baseball players who wanted to improve their throwing. He instead emphasizes the differences: J.R.H. was much younger than the other boys, he was the only one to have slept over, and he was the only one to say that defendant had offered money and to allege penetration. Even if the evidence were of a distinctive pattern of criminal behavior, he continues, the State still did not demonstrate the relevance of the other testimony because identification was not at issue, so *modus operandi* evidence was unnecessary, nor was intent. Moreover, defendant argues, the State did not prove that the other acts were for the purpose of sexual gratification, so it did not prove the elements of sexual abuse, making evidence of these acts inadmissible. Lastly, he asserts that even if admissible, this testimony's prejudicial effect far outweighed any probative value given that allegations of child sexual abuse are highly inflammatory and that that evidence was the bulk of the State's case. He concludes that without this testimony, the State's case was not overwhelming because J.R.H.'s credibility was questionable due to the lack of immediate outcry, the absence of an admission by defendant, the lack of corroborating medical evidence, and the inability of the boy and his mother to recall the date on which the events occurred.

Generally, in cases of sexual misconduct involving a child victim, the State may not present evidence of similar offenses with other children unless it is relevant for purposes other than propensity. (*People v. Mason* (1991), 219 Ill. App. 3d 76, 80, 578 N.E.2d 1351, 1354 (remand ordered due to inadvertent elicitation of evidence that defendant had molested others); *People v. Daniels* (1988), 172 Ill. App. 3d 616, 624, 527 N.E.2d 59, 64.) Although the abuse of discretion standard is typically invoked when reviewing admission of evidence of other offenses because "it is within the sound discretion of the trial court to determine whether evidence of other [offenses] is relevant to a material issue and whether the probative value of such evidence outweighs its prejudicial impact" (*People v. Brown* (1991), 214 Ill. App. 3d 836, 844-45, 574 N.E.2d 190, 195, *appeal denied* (1991), 141 Ill. 2d 547, 580 N.E.2d 121), the improper admission of evidence of sexual misconduct with other children in a case like this one ordinarily requires reversal. *Mason*, 219 Ill. App. 3d at 80, 578 N.E.2d at 1354.

■ Preliminarily, we note that contrary to defendant's premises, "other offenses" evidence is not limited to conduct for which a defendant has been proven guilty beyond a reasonable doubt (*People v. Partin* (1987), 156 Ill. App. 3d 365, 370, 509 N.E.2d 662, 665, *appeal denied* (1987), 116 Ill. 2d 571, 515 N.E.2d 121), nor is *modus operandi* evidence admissible only if the identity of the perpetrator is

in doubt (*Brown*, 214 Ill. App. 3d at 845, 574 N.E.2d at 195-96). To the extent that this view is at odds with the court's ruling on this point in *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667, we must disagree with *Barbour*.

In *Barbour*, the defendant objected to admission of evidence of two earlier alleged rapes on which no charges had been brought. The appellate court agreed. It first explained the difference between common design ("a larger criminal scheme of which the crime charged is only a portion"), which is generally relevant for motive, and *modus operandi* ("a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer"), which is "most useful in showing that the accused is the perpetrator." (106 Ill. App. 3d at 999-1000.) After the appellate court summarily dismissed the use of the evidence to prove a common scheme, it held that the State had not made the "strong and persuasive showing of similarity" that the *modus operandi* exception required because the "[t]he State's lengthy list of purported similarities [did] not establish that the three alleged rapes were 'so nearly identical in method as to earmark them as the handiwork of the accused.' " (106 Ill. App. 3d at 1000.) Even if the State had done so, the court continued, the evidence was not relevant for establishing identity, about which there was no question, nor for consent. The court concluded that the only purpose for which the evidence had been offered was the inference that the defendant had a propensity for rape. As a result, the court held that admission of the evidence was reversible error.

The alternative view is represented by *Brown, People v. Fuller* (1983), 117 Ill. App. 3d 1026, 454 N.E.2d 334, and *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292, *appeal denied sub nom. People v. Green* (1986), 111 Ill. 2d 573, 488 N.E.2d 272. In *Brown*, a rape case, two women other than the complainant were allowed to testify, over *Barbour* objections, about similar assaults by the defendant. The appellate court ruled that the similarities between the crime charged and the other alleged assaults were sufficient to "establish 'a substantial and meaningful link between the offenses being compared' and are 'not common to most offenses of that type.' [Citation.]" (*Brown*, 214 Ill. App. 3d at 846.) The similarities included telling each victim about a job at Water Tower Place, luring each to an "office" to prepare resumes, the victims' race, and a similar method of molestation. The court also held that the testimony was admissible as *modus operandi* evidence even though the identity of the perpetrator was not at issue.

Here, the similarities in the events recounted in the testimony of the boys are striking in features both common in such offenses (*e.g.*, the

youth of the boys and isolating them during the incidents) and uncommon (*e.g.*, the boys' build, the manner in which defendant lured them to the "clubhouse" with promises of increasing their athletic skills, the "exercises" he asked them to perform, and the method by which he assisted the boys in performing them). Although it is true that the challenged evidence described sexual conduct without either penetration, offer of money, or an overnight stay, these dissimilarities are not fatal. (*People v. Williams* (1989), 185 Ill. App. 3d 840, 853-54, 541 N.E.2d 1175, 1186 (there must be a strong and persuasive showing of similarity but the conduct need not be identical), *appeal denied* (1989), 127 Ill. 2d 639, 545 N.E.2d 129, citing *People v. Phillips* (1989), 127 Ill. 2d 499, 521, 538 N.E.2d 500, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.) As in *Williams* and the cases cited therein, here the differences between the events described by the other three boys are vastly outweighed by the similarities that made defendant's conduct unique. As a result, we find that the evidence was relevant and therefore admissible as probative of defendant's *modus operandi*.

Furthermore, although this testimony certainly was damaging to defendant, any prejudice from it would not outweigh its probative value because the testimony was not in fact the bulk of the State's case (as shown in the number of witnesses and pages of testimony), and the jury was admonished to consider it only for limited purposes. Moreover, that the jury asked only for the testimony of J.R.H. and defendant during its deliberations indicates strongly that its focus was on the incident in question.

As for the introduction of the evidence to establish intent, we believe the error, if any, was harmless for reasons given below.

## V

Defendant also claims that he was entitled to have the jury instructed on the offense of aggravated criminal sexual abuse and the definition of sexual conduct because a defendant is entitled to instructions for lesser included offenses even if the proof is very slight and even if it conflicts with the defendant's theory, citing among other cases, *People v. Creamer* (1986), 143 Ill. App. 3d 64, 492 N.E.2d 923. Here, he insists, the jury could have concluded that defendant committed only the abuse offense because J.R.H. was blindfolded during the alleged sexual penetration, and defendant admitted touching the boy, albeit innocently. The court's refusal to allow the jury to render a verdict of abuse, defendant reasons, warrants a new trial.

■ Although a defendant is entitled to a jury instruction on a lesser included offense even if it conflicts with a defendant's theory so long as

the instruction is justified by "very slight evidence upon a certain theory of the case," or even if it conflicts with a defendant's theory (*Creamer*, 143 Ill. App. 3d at 69, 492 N.E.2d at 927), aggravated criminal sexual abuse simply is not a lesser included offense of aggravated criminal sexual assault. A lesser included offense is one that "contains some but not all of the elements of the greater offense and contains no element not included in the greater." (*People v. Maldonado* (1992), 224 Ill. App. 3d 913, 917, 586 N.E.2d 788, 791; Ill. Rev. Stat. 1991, ch. 38, par. 2—9(a) (included offense is one established by proof of same or fewer facts, or less culpable mental state, or both, than charged crime).) The abuse offense includes an element not essential to the assault, that is, the purpose of sexual gratification or arousal of the accused or the victim (compare Ill. Rev. Stat. 1991, ch. 38, pars. 12—15, 12—12(e)). Penetration, on the other hand, implies only knowledge, intent, or recklessness, not necessarily a purpose of sexual gratification. (*People v. Terrell* (1989), 132 Ill. 2d 178, 209-11, 547 N.E.2d 145, 158, *cert. denied* (1990), 495 U.S. 959, 109 L. Ed. 2d 749, 110 S. Ct. 2567.) Thus, because aggravated criminal sexual abuse includes a different, specific mental state and requires proof thereof, it cannot be a lesser included offense of aggravated criminal sexual assault. We therefore reject the statement in *Creamer*, adopted in *People v. Finley* (1988), 178 Ill. App. 3d 301, 306, 533 N.E.2d 94, and *People v. Patel* (1991), 213 Ill. App. 3d 688, 697, 572 N.E.2d 314, 320, that aggravated criminal sexual abuse is a lesser included offense of aggravated criminal sexual assault because the only difference between the two crimes is penetration.

Even if those cases were correct, *Creamer* held that the abuse instruction should have been given because the victim's testimony that penetration had occurred was equivocal. No such equivocation, nor any other evidence that penetration might not have occurred, appears in this record. As a result, we hold that the circuit court's refusal to instruct the jury on the other offense was not an abuse of discretion.

## VI

Next, defendant contends that Milanovich and Lenti were improperly allowed to give opinion testimony even though, as lay witnesses, they could render opinions only in limited circumstances not applicable here. These witnesses' testimony about defendant's training program and its effect on muscles was not about matters of which the average person has knowledge, he continues, so it was error to admit their opinions about it, just as it was error to allow them to give their opinions about the efficacy of the training techniques described in articles by others. Because this testimony could have led the jury to believe that

defendant's training program was merely a ruse to lure J.R.H. to his office, he concludes, a new trial is warranted.

In its rebuttal case, the State may offer "[e]vidence which would tend to 'explain, repel, contradict or disprove the evidence of the defendant.' " (*People v. Lucas* (1989), 132 Ill. 2d 399, 434, 548 N.E.2d 1003, 1017, quoting *People v. Daugherty* (1969), 43 Ill. 2d 251, 255.) Whether offered in the case in chief or rebuttal, expert testimony is that which concerns "subject matter *** sufficiently beyond the common experience of ordinary lay individuals such that only persons of a particular skill or experience are capable of forming a judgment based on the facts presented." (*People v. Masor* (1991), 218 Ill. App. 3d 884, 887, 578 N.E.2d 1176, 1179 (explaining when expert testimony is not required).) It is admitted when the witness' experience and qualifications afford such knowledge, if the testimony will aid the factfinder in reaching a verdict. (*People v. Enis* (1990), 139 Ill. 2d 264, 288, 564 N.E.2d 1155, 1164.) A decision to admit evidence will be reversed only if the circuit court abused its discretion and the defendant suffered prejudice as a result. *People v. Williams* (1991), 209 Ill. App. 3d 709, 723, 568 N.E.2d 388, 396, *appeal denied* (1991), 139 Ill. 2d 604, 575 N.E.2d 922.

■ Even if the testimony here were outside the realm of common knowledge and experience, so that only an expert could address it, defendant was not prejudiced by its admission. Unlike the testimony of the young victim in *People v. Daniels* (1987), 164 Ill. App. 3d 1055, 518 N.E.2d 669 (*Daniels I*), in which the court held that the victim's impeached testimony needed corroborating evidence to sustain the conviction because it was not sufficiently "clear and convincing," J.R.H.'s testimony was convincing, cogent, concise, and consistent. It alone, therefore, is sufficient to sustain defendant's conviction; corroboration in the form of eyewitnesses, medical evidence, prompt complaint, and the like is unnecessary. (*People v. Daniels* (1988), 172 Ill. App. 3d 616, 622-23, 527 N.E.2d 59, 63-64 (testimony of victim alone was sufficient to sustain conviction because it was clear and convincing despite conflicts with prior testimony and history of lying) (*Daniels II*).) Any error, therefore, does not require reversal in this case.

## VII

Defendant asserts that the circuit court should not have given instructions about other crimes evidence (IPI Criminal 2d No. 3.14) because the State may not prove intent through such evidence, reiterating his argument from Part IV above. Giving IPI Criminal 2d No. 11.67 (Supp. 1989) was improper as well, he continues, not only because it is unconstitutional, as he argued in Part I, but also because it is "an erro-

neous instruction which misstates the law" in that it contains no language instructing the jury that the statements should be considered only as they demonstrate the reliability of a child's in-court testimony, and worse yet it tells the jury to determine the weight the statement should be given. Lack of a proper limiting instruction warrants reversal, he contends, and any mistake he made in not offering one was not waived because the instruction "emanates from the General Assembly who used mandatory language with regard to the giving of the instruction."

As for the lack of language in IPI Criminal 2d No. 11.67 (Supp. 1989) limiting the use of J.R.H.'s out-of-court statements, we find no reason for requiring such language. If defendant's interpretation of the statute were correct, these statements could never be admitted unless a child testifies in court. Under the statute, however, the statements are admissible under certain conditions even if a child is unavailable to testify. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(b)(2)(B).) As a result, we find no intent on the part of the legislature to limit use of the statements as defendant urges us to do. In addition, as we explained above, IPI Criminal 2d No. 11.67 (Supp. 1989) does not misstate the law, given that its language tracks the statute, which *is* the law. Thus, the circuit court's decision to give the instruction was correct.

Similarly, in light of the strength of the State's case, any error in instructing the jury that the evidence could be considered to prove intent was not reversible. *People v. Leger* (1992), 149 Ill. 2d 355, 404, 597 N.E.2d 586, 608 (even though attempted murder instruction misstated the law, error was not reversible because the State presented substantial evidence of defendant's guilt), *petition for cert. filed* October 28, 1992.

For the reasons given above, we affirm the judgment of the circuit court.

Affirmed.

McCORMICK, P.J., and SCARIANO, J., concur.